IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Frank A. and Shelly Palombaro, Jr., *et al.*, | : : : | Case No. 1:15-cv-792 |
| Plaintiffs, | : : | Judge Susan J. Dlott |
| v. | : : | **Order Granting Plaintiffs' Second Amended Motion for Class Certification** |
| Emery Federal Credit Union, | : : | |
| Defendant. | : | |

This matter is before the Court on Plaintiffs' Second Amended Motion for Class

Certification.  (Doc. 325.)  Defendant Emery Federal Credit Union ("Emery") opposes the

Motion.  (Doc. 330.)  For the reasons that follow, the Court will GRANT the Motion.

I.      **BACKGROUND AND PROCEDURAL POSTURE**

   A.  **Background**[1]

Plaintiffs allege that between 2009 and 2014, Genuine Title, LLC ("Genuine Title"),

pursuant to an agreement, paid kickbacks to Emery employees in exchange for referrals in

connection with loan settlement services.  (Fourth Am. Compl. at ¶ 4, PageID 9348, Doc. 324.)

Plaintiffs also allege that Genuine Title split the fees it received for such settlement services with

the Emery employees implicated in the alleged scheme, and that these kickbacks were not in

exchange for services actually performed by these Emery employees.  (*Id.* at ¶¶ 4, 66, PageID

9348, 9360.)[2]  Plaintiffs argue that these kickbacks violated the Real Estate Settlement

---

[1] Any recitation here of allegations made in Plaintiffs' Fourth Amended Complaint (Doc. 324) or Second Amended Motion for Class Certification (Doc. 326) does not assume their truth for the purposes of deciding this Motion, but is used to provide contextual information.  *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (district courts are not to presume the truth of the plaintiffs' allegations for purposes of class certification).

[2] Plaintiffs cite testimony by Genuine Title president, Jay Zukerberg, and its marketing manager, Brandon Glickstein, in support of these allegations.  (*See* Second Am. Mot. Class Cert. at PageID 10433–41, Doc. 326-1 (and testimony cited therein).)

Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and that named Plaintiffs and putative

class members represent those affected by this scheme.  (*Id.* at ¶ 3, PageID 9348.)

These kickbacks were orchestrated by and through certain principals and employees of

Genuine Title and Emery, as well as through associated "sham" companies.[3]  (*Id.* at ¶¶ 3, 21,

PageID 9348, 9351.)  For example, Brandon Glickstein was Genuine Title's marketing manager.

(Second Am. Mot. Class Cert. at PageID 10432, Doc. 326-1.)  He formed Brandon Glickstein,

Inc. ("BGI") and Competitive Advantage Media Group, LLC ("CAM"), both of which served as

conduits for certain kickbacks.[4]  (Fourth Am. Compl. at ¶¶ 24, 26–27, PageID 9352–53, Doc.

324.)  Jay Zukerberg, Genuine Title's president, has acknowledged the existence and operation

of a kickback scheme.  (Second Am. Mot. Class Cert. at PageID 10432.)

During discovery, both Emery and Genuine Title produced data[5] cataloguing loans

referred to Genuine Title by Emery; according to Plaintiffs, cross referencing this data results in

4,452 loans between these two lists that match (the "Matched Class Loans").  (Second Am. Mot.

Class Cert. at PageID10441, Doc. 326-1.)  Thirteen Emery branches were involved with loan

transactions making up the Matched Class Loans.  (*Id.* at PageID 10441–42.)  The named

Plaintiffs worked with one of two such Emery branch employees: Adam Ellis or Gary Klopp.

(Fourth Am. Compl. at ¶¶ 61–64, PageID 9359, Doc. 324.)

---

[3] Plaintiffs have presented evidence of cash kickbacks in the form of checks from Genuine Title to both individuals and to various "sham" companies used by Emery employees to receive such kickbacks.  (*See, e.g.,* Fourth Am. Compl. at Exs. 4–13, Docs. 324-4–324-13; Second Am. Mot. Class Cert. at Exs. 8–14, 20, Docs. 326-9–326-15, 326-24.)

[4] Plaintiffs have also presented evidence of marketing credit kickbacks, as opposed to cash kickbacks, in the form of invoices from CAM to Emery employee Brett Springer's Emery branch.  (*See, e.g.,* Second Am. Mot. Class Cert. at Ex. 17, Tabor Aff., Doc. 326-21.)

[5] Genuine Title's data was generated by Title Express, a software program that Genuine Title used from approximately 2006 to 2013 to keep an electronic record of loans it either closed or for which it provided a settlement service.  (Second Am. Mot. Class Cert. at PageID 10441, Doc. 326-1.)

Named Plaintiffs Frank and Shelly Palombaro closed their VA[6] streamline home refinance on or about March 2, 2012.  (Second Am. Mot. Class Cert. at PageID 10446, Doc. 326-1.)  Named Plaintiffs Melinda and David Alvarado closed their VA streamline home refinance on or about August 23, 2012.  (*Id.*)  Named Plaintiffs Kevin and Jennifer McAlpin closed their VA streamline home refinance on or about October 22, 2012.  (*Id.*)  Klopp's Emery branch brokered all three of these closings.  (*Id.*)  In the month following each, Plaintiffs allege that Klopp received a check through his "sham" company used at that time, Carroll Abstracts, which included a kickback for the referral of each of the above-referenced loans.  (*Id.*)

Named Plaintiff Gary Ratcliff closed his VA streamline home refinance on or about March 8, 2012.  (*Id.*)  Ellis brokered this closing.  (*Id.*)  The following month, Plaintiffs argue that Ellis received a check through his "sham" company, Mystion Abstracts, which included a kickback for the referral of Ratcliff's loan.  (*Id.* at PageID 10446–47.)

Each of the HUD-1s[7] associated with the named Plaintiffs' loans lists settlement services provided by Genuine Title.  (*Id.* at PageID 10446–47.)  The HUD-1s do not disclose kickbacks from Genuine Title to Emery employees.  (*Id.* at Exs. 21(A)–(D), Docs. 326-25–326-28 (named Plaintiffs' HUD-1s).)

The Consumer Financial Protection Bureau ("CFPB"), aided by the Consumer Protection Division of the Office of the Attorney General of Maryland ("CPD"), filed a complaint against certain Emery employees and the entities that they created that were associated with receiving kickbacks.  (Fourth Am. Compl. at ¶ 58, PageID 9358, Doc. 324.)  Upon discovery of this

---

[6] "VA" refers to loans obtained through the Department of Veterans Affairs.

[7] This refers to the standard Department of Housing and Urban Development form listing all charges associated with real estate settlements or mortgage refinances.  *What is a HUD-1 Settlement Statement*, CONSUMER FINANCIAL PROTECTION BUREAU, https://www.consumerfinance.gov/ask-cfpb/what-is-a-hud-1-settlement-statement-en-178/ (last visited July 25, 2017).

investigation, Genuine Title began generating and backdating "sham" title services agreements.[8]
(Second Am. Mot. Class Cert. at PageID 10436, Doc. 326-1.)  Klopp, and two other Emery
employees, Adam Mandelberg and Angela Pobletts, entered into Stipulated Final Judgments and
Orders with the CFPB limiting their participation with the mortgage industry, requiring payment
of a civil penalty, and requiring continued cooperation with the CFPB in complying with these
orders.  (Fourth Am. Compl. at Exs. 18, 19, Docs. 324-18, 324-19; Second Am. Mot. Class Cert.
at Ex. 16, Doc. 326-20.)  In these orders, the Emery employees "neither admit nor deny any
allegations" against them, except to the extent made explicit in such orders.  (Fourth Am. Compl.
at PageID 9521, 9530, Doc. 324; Second Am. Mot. Class Cert. at PageID 11070, Doc. 326-1)

### B.  Procedural History

The Court previously set forth the procedural history of this case in its Order Denying
Defendant's Motion to Dismiss and Granting Defendant's Motion to Strike.  (Doc. 242.)  The
present Motion is before the Court pursuant to its Order Granting in Part and Denying in Part

---

[8] Jay Zukerberg, Genuine Title's president, testified:

A. [Upon learning of the investigation] I panicked pretty much. . . . [I] told them . . . I already have
an agreement with another lender. Maybe it's better safe than sorry to have this agreement . . . .
[It] was just a blatant lie as far as having that backdated. . . . [T]hose agreements that you have
with the exception of the Federal Savings Bank were nothing. . . . They were not legitimate
agreements to begin with.
            . . . .

Q. Okay. So you decided at that point to have [Emery employees] execute these sort of sham
agreements to try to explain why they were receiving these payments for the last two or three
years?

A. Correct.

Q. Okay. When the payments . . . weren't, in fact, for providing any services, they were actually
referral fees for settlements?

A. Correct.

(Zukerberg Dep. 46:3–18, 47:21–48:8 at PageID 5606–5608, Doc. 297; *see also* Second Am. Mot. Class Cert. at
Exs. 15(A)–15(D), Docs. 326-16–326-19 (examples of "sham" title services agreements).)

Plaintiffs' Motion to Substitute Named Plaintiff and Putative Class Representative and to Amend

the Complaint (Doc. 323), in which the Court directed Plaintiffs to file a new Class Certification

Motion and Memorandum in Support.  The Court specifically directed Plaintiffs to correct errors

made in their prior submissions.  (*Id.* at PageID 9346.)

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 23

A district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  Implicit in this Rule is the requirement that the proposed class be

"adequately defined and clearly ascertainable."  *Rose v. Saginaw Cnty.*, 232 F.R.D. 267, 271

(E.D. Mich. 2005) (quotation omitted).  Certification is proper "only if 'the trial court is satisfied,

after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350–351, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel.*

*Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388,

397 (6th Cir. 1998) (en banc).

In addition to meeting the Rule 23(a) criteria, the proposed class also must meet at least

one of the requirements listed in Rule 23(b).  *Dukes*, 564 U.S. at 345; *Sprague*, 133 F.3d at 397.

Here, Plaintiffs seek certification under Rule 23(b)(3) on the basis that "questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs carry the burden of proving that the class certification prerequisites are met. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Plaintiffs, as class representatives, also are required to establish that they possess the same interest and suffered the same injury as the class members that they seek to represent. *Dukes*, 564 U.S. at 348–49. "The trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079.

## III. ANALYSIS

### A. Rule 23(a) Requirements

#### 1. Ascertainability

"For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (quoting MOORE'S FEDERAL PRACTICE § 23.21[3]). Defendant does not explicitly cite this implicit Rule 23(a) requirement as part of its opposition brief. Nevertheless, as part of the "rigorous analysis" required under *Dukes*, the Court evaluates this factor.

Plaintiffs propose the following class definition:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Emery for which Genuine Title provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2009, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009, through December 31, 2014, was an employee, officer, member and/or agent of Defendant Emery Federal Credit Union, Genuine Title LLC, Brandon Glickstein, Inc., Competitive Advantage Media Group LLC, and/or Dog Days Marketing, LLC.

(Second Am. Mot. Class Cert. at PageID 10447, Doc. 326-1.).

6

Plaintiffs attach to their Motion spreadsheets produced by both Emery and by Genuine Title identifying loans that were referred to Genuine Title by Emery. (*Id.* at Exs. 5–6, Docs. 326-6–326-7.) These lists include the loan dates, names of borrowers, and property addresses. Plaintiffs also attach a list of the Matched Class Loans that Plaintiffs contend will represent the bulk of the borrowers in this class. (*Id.* at Ex. 7.) The parties do not appear to dispute that the Matched Class Loans are "federally related mortgage loan[s]" as that term is used in the proposed class definition and as defined by statute.[9] 12 U.S.C. § 2602(1). There is, likewise, no dispute that the HUD-1 form referenced in the proposed definition is a government-mandated form that can be referred to in the case of each putative class member.

At the oral argument held July 18, 2017, Emery would not stipulate to the accuracy of the Matched Class Loans and argued that the verification of unmatched loans would be difficult. Without more, however, the Court is unwilling to deny Plaintiffs' Motion on this basis, where there appears to be significant data and relatively straightforward investigatory procedures (*e.g.*, abstracts of title) that can be used to identify class members.

In view of the foregoing, the Court finds that Plaintiffs have sufficiently demonstrated that their proposed class is ascertainable.

### 2. Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. While the numerosity requirement is not tied to any fixed numerical threshold, "substantial" numbers usually satisfy this requirement. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir.

---

[9] Defendant strenuously argues, however, that certain putative class members under this proposed class definition will nevertheless fall within an express exception to RESPA's coverage. This will be discussed *infra* as part of the Rule 23(b)(3) predominance inquiry.

2006). Defendant does not challenge the numerosity requirement and the Court finds that the approximately 4,000–5,000-member class envisioned here satisfies Rule 23(a)(1). *See, e.g., Baehr v. Creig Northrop Team, P.C.*, No. WDQ-13-0933, 2014 WL 346635, at *8 (D. Md. Jan. 29, 2014) (finding that a class of 3,000–4,000 satisfied numerosity).

### 3. Commonality (Rule 23(a)(2))

Rule 23(a)(2) requires plaintiffs to show that "there are questions of law or fact common to the class." Plaintiffs should be able to demonstrate that the members of the class "have suffered the same injury." *Dukes*, 564 U.S. at 350. "Their claims must depend upon a common contention" and that contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quotation omitted).

Plaintiffs present the following common issues of fact with respect to class members' RESPA claims:

- the existence of a referral agreement for the referral of loans for settlement services in exchange for things of value and/or the splitting of fees;

- the actual referral of loans by Emery employees to Genuine Title pursuant to the referral agreement; and

- the payment by Genuine Title and the receipt by Emery's employees of things of value in exchange for the referral of loans.

(Second Am. Mot. Class Cert. at PageID 10451, Doc. 326-1.) With respect to the threshold issue of equitable tolling for all class members, Plaintiffs present the following common issues of fact:

- whether Emery's practice was to disclose in any section of a borrower's HUD-1 the fact or amount of the funds received from Genuine Title for the referral of the borrower's loan or otherwise put borrowers on notice of its coordinated business relationship with Genuine Title;

- whether Emery employees participated in concealing the illegal kickback scheme to avoid detection by regulators or borrowers, including the Emery Class members; and

- whether, after receiving specific information about Genuine Title's payments of kickback to Emery employees, Emery ever put Emery Class members on notice of facts giving rise to their RESPA claims.

(*Id.* at PageID 10451–52.)

Emery spends little time on the commonality requirement relative to other arguments in its opposition brief—arguing, primarily, that Plaintiffs' recitation of the RESPA claim elements cannot be a substitute for the "common questions" required by this prong of Rule 23. The Court disagrees. The fact that these questions mirror the elements of RESPA claims does not make them less pertinent to the resolution of this lawsuit.

In *Dukes*, the Supreme Court declined to certify a class action of female Wal-Mart employees alleging sex discrimination under Title VII of the Civil Rights Act of 1964 due to lack of equal pay or promotion. 564 U.S. at 343. The Court decided that commonality was not met where there was neither evidence of a specific, biased employee evaluation procedure, nor evidence of a general employee evaluation policy that was discriminatory—either of which would have driven the litigation as affecting all putative class members. *Id.* at 353–54. By contrast, the essence of this case is a pervasive and, at least to a degree, confessed kickback scheme that would have affected nearly all putative class members in very similar—if not identical—ways. The existence and performance of such a widespread scheme undoubtedly generate common questions, eliciting common answers, that are highly relevant to Defendant's

liability vis-à-vis the purported class members in this case. The common questions that Plaintiffs have proposed regarding equitable tolling are likewise relevant, on a class-wide basis, to the applicability of tolling in the face of Emery's alleged fraudulent concealment of the RESPA violations and to the corresponding level of due diligence required of class members.[10]

Emery also advances three, additional brief arguments related to commonality. First, it argues that Plaintiffs have not fully corroborated the alleged kickback payments with evidence thereof. Second, it argues that Plaintiffs' class would to include twenty-seven Emery branches for which there is no evidence of the wrongdoing alleged. The Court finds these to be unwarranted invitations to pass on the merits of Plaintiffs' case, which is not necessary at this point in litigation.[11] In addition, Plaintiffs maintain that the Matched Class Loans—the bulk of those covered under their proposed class definition—implicate only thirteen Emery branches. (Pls.' Reply at PageID 11885, Doc. 333.) To the extent that this remains a question of fact to be determined, the Court does not find that this cuts against granting class certification in the context of commonality at this stage.

Third, Defendant argues that varying damages among class members destroys commonality. It does not. The statutory framework for damages under RESPA ties penalties to the total settlement charges and not to the amount of each particular kickback. 12 U.S.C. § 2607(d)(2). While a degree of individual inquiry is necessary, it would not overwhelm the proceedings and damages could be determined easily by reference to objective, available evidence (*i.e.*, class members' HUD-1s). *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013) ("[R]ecognition that individual damages

---

[10] *See infra* pages 14–20 for further discussion regarding equitable tolling.

[11] Resolving factual or legal issues may be appropriate the context of a class certification motion if resolution would "strongly influence the wisdom of class treatment[,]" but it is not required. *Gooch*, 672 F.3d 417.

calculations do not preclude class certification . . . is well nigh universal.") (quoting *Comcast Corp. v Behrend*, 133 S. Ct. 1426, 1437, 185 L.Ed.2d 515 (2013)).

For these reasons, the Court concludes that Plaintiffs' have met their burden as to Rule 23(a)(2).

### 4. Typicality (Rule 23(a)(3))

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Sixth Circuit has explained:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

> [1 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS, § 3-13, at 3-76 (3d ed. 1992).] . . . A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*In re Am. Med. Sys., Inc.*, 75 F.3d at 1082. "The existence of defenses against certain class members does not necessarily defeat typicality." *NorCal Tea Party Patriots v. I.R.S.*, No 1:13-cv-341, 2016 WL 223680, at *8 (S.D. Ohio Jan. 19, 2016). "Typical does not mean identical, and the typicality requirement is liberally construed." *Id.* (quotation omitted).

Plaintiffs argue that the class representatives assert the same violations of 12 U.S.C. § 2607 related to the same illegal kickback scheme and allege the same factual pattern for equitable tolling as all other class members. Emery argues that, because only two of the several

Emery branches implicated in the "kickback" scheme worked with named Plaintiffs, their claims are not typical of the rest of the class, who may have dealt with some eleven—at minimum—other Emery employees.  Emery further argues that the putative class may include some individuals who did not work with Emery employees who received kickbacks.

Emery's arguments are not persuasive.  As to the latter, Emery appears to be arguing as to the class's overbreadth;[12] but this does not undercut that named Plaintiffs are typical of other class members who suffered the same damages related to the alleged conduct.  As to the former, the kickback scheme does not appear to vary significantly from Emery employee to Emery employee.[13]  Differences in the form or amount of the kickback are not relevant to whether Emery's overall conduct, if otherwise uniform and proven, is culpable.  Particularly in view of case law suggesting liberal interpretation of this factor, the Court finds that Plaintiffs have demonstrated that the experience of the named Plaintiffs relative to the alleged RESPA violations and concealment thereof are typical of the proposed class.

### 5.  Adequacy (Rule 23(a)(4))

Rule 23(a)(4) requires that named Plaintiffs fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  Courts examine two criteria to determine adequacy: "1) the

---

[12] The Court is also not persuaded by Emery's acknowledged arguments as to overbreadth.  The facts that Emery's national lending presence did not begin until after January 1, 2009 and that Genuine Title had been placed into receivership prior to December 31, 2014 suggest that Plaintiffs will identify fewer class members during those times.  Plaintiffs do not refute either assertion, and the proposed class definition does not appear to risk inclusion of class members not injured by the alleged kickback scheme.

[13] At the oral argument held on July 18, 2017, Plaintiffs' counsel acknowledged that it may prove appropriate—in view of evidence developed—to amend the course of the proceedings with respect to some class members affected by kickbacks that took the form of marketing credits (*e.g.,* create a subclass).  The Court does not find that the potential for bifurcation prohibits class certification at this stage in the proceedings.  *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997) ("It may be that the best remedy to both the purportedly atypical claims and defenses would be to create sub-classes. Rule 23 does not require such an action at this stage.").

representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys.*, 75 F.3d at 1083. Rule 23(a)(4) tests "the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977).

These requirements are met. Emery does not dispute this element, and the Court finds that Plaintiffs have demonstrated that the named Plaintiffs' interests are aligned with those of the class as a whole and that Plaintiffs' counsel have the experience and competence to carry out the litigation. (*See* Second Am. Mot. Class Cert. at PageID 10453–54, Doc. 326-1 (and testimony/affidavits referenced therein).)

### B. Rule 23(b) Requirements

Under Rule 23(b)(3), a court may certify a class if Rule 23(a) is satisfied and if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both the predominance and superiority requirements were added to the Federal Rules "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S. Ct. 2231, 2246 (1997) (quoting Fed. R. Civ. P. 23(b)(3), Adv. Comm. Notes to 1966 Amendment). The predominance and superiority requirements are "far more demanding" than Rule 23(a)(2)'s commonality requirement. *Id.* at 624. It is under Rule 23(b) that proposed RESPA classes

13

within this Circuit have been found deficient.  *See, e.g., Pettrey v. Enter. Title Agency*, 241

F.R.D. 268, 283–84 (N.D. Ohio 2006), *appeal dismissed*, 584 F.3d 701 (6th Cir. 2009); *Carter v.*

*Welles-Bowen Realty, Inc.*, Nos. 3:05CV7427; 3:09CV400, 2010 WL 908464, at *2–3 (N.D.

Ohio Mar. 11, 2010); *Toldy v. Fifth Third Mortg. Co.*, No. 1:09 CV 377, 2011 WL 4634154, at

*2–4 (N.D. Ohio Sept. 30, 2011).  The Court will examine the two prongs of Rule 23(b) below.

### 1. Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  "To meet the predominance

requirement, a plaintiff must establish that issues subject to generalized proof and applicable to

the class as a whole predominate over those issues that are subject to only individualized proof."

*Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011).  Emery raises a

number of issues that challenge a finding of predominance.  The Court will address each in turn.

### a. Statute of limitations/equitable tolling

Emery argues that RESPA's one-year statute of limitations, running from the date of the

closing of a litigant's loan, presents an insurmountable roadblock to certifying this class and—in

particular—to meeting the predominance requirement of Rule 23(b)(3).  Plaintiffs concede that

all purported class members closed their loans more than one year prior to the filing of the

Second Amended Complaint (Doc. 47) on January 2, 2015, thus invoking the doctrine of

"equitable tolling" to the extent that such claims could nevertheless be permitted to proceed.

(Second Am. Mot. Class Cert. at PageID 10451, Doc. 326-1.)  Equitable tolling, as recently

clarified by the Supreme Court, requires that a litigant show each of the following elements: "(1)

that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance

stood in his way and prevented timely filing."  *Menominee Indian Tribe of Wisc. v. U.S.*, 136 S.

Ct. 750, 755, 193 L. Ed. 2d 652 (2016) (quotation omitted). "[T]he propriety of equitable tolling is determined on a case-by-case basis and is to be narrowly applied." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 424 (6th Cir. 2009).

Emery cites several cases that discuss the intersection between RESPA statute of limitations issues and predominance under Rule 23(b). In particular, it cites these cases to show that the applicability of equitable tolling requires investigation as to each Plaintiff on the required diligence and extraordinary circumstances faced in view of the specific information that they each may have received in connection with their loan closing. Plaintiffs argue that, if not wholly eliminating individual inquiry, the question of whether Emery fraudulently concealed the kickback scheme would be subject to generalized proof and is highly relevant to both *Menominee* prongs (*i.e.,* the level of diligence required and the presence of extraordinary circumstances). (*See, e.g.,* Second Am. Mot. Class Cert. at Exs. 15(A)–15(D), Docs. 326-16–326-19 ("sham" title services agreements created between Genuine Tile and certain implicated Emery employees upon discovering the CFPD/CPD investigations); *id.* at PageID 11355–56, Doc. 326-1 (Plaintiffs' discussion thereof); *supra* note eight (testimony regarding, and copies of, "sham" title services agreements).)

The first case cited by Emery, *Contos v. Wells Fargo Escrow Company, LLC*, No. C08-838Z, 2010 WL 2679886 (W.D. Wash. July 1, 2010), dealt with a proposed class in which a substantial portion its members "had actual knowledge of [the facts giving rise to the alleged RESPA violation] prior to closing." *Id.* at *7. The *Contos* court, however, specifically contrasted its facts with those in another case dealing with equitable tolling in which class certification *had* been granted, *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D 572, 580 (M.D. Fla. 2006), where the "defendant fraudulently concealed information necessary to establish the

15

plaintiffs' claims from the entire proposed class." *Contos*, 2010 WL 2679886, at *7.  The Court finds fraudulent scheme discussed in *Veal* more akin to the facts before it.

In the second case, *Pettrey,* the district court expressly stopped short of holding that the applicability of defenses, such as statute of limitations, automatically barred a finding of predominance; but it concluded that a number of individualized issues in that particular case predominated—including those related to state law claims that are not present in the case at bar. *Pettrey*, 241 F.R.D. at 284 & n.18.

In the third, *Minter v. Wells Fargo Bank, N.A.*, No. WMN-07-3442, 2013 WL 1795564 (D. Md. Apr. 26, 2013), the court concluded that a class action could not be sustained where the required due diligence of class members varied.  *Id.* at *3–4.  Emery then relies on *Riddle v. Bank of America Corp.*, 588 F. App'x 127, 130 (3d Cir. 2014), for its strong language requiring affirmative investigation of potential RESPA claims between the closing of the plaintiffs' loans and the time that they were contacted by counsel.  But subsequent authority in the Third Circuit has concluded that "when a wrongful scheme is perpetrated through the use of common documentation, such as the documents employed to memorialize each putative class member's mortgage loan, full participation in the loan process alone is sufficient to establish the due diligence element [of an equitable tolling argument]."  *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 404 (3d Cir. 2015), *cert. denied sub nom. PNC Bank v. Brian W.*, 136 S. Ct. 1167, 194 L. Ed. 2d 241 (2016).

In *Cunningham v. M & T Bank Corporation*, 814 F.3d 156 (3d Cir. 2016), the Court considered due diligence in the context of reinsurance agreements accompanied by lengthier and more specific disclosures "explaining reinsurance in plain language, stating that reinsurance could be with a company affiliated with the lender, that the reinsurance company would receive a

16

percentage of the mortgage, and that the mortgagor had the opportunity to opt out of captive reinsurance." *Id.* at 161.  The *Cunningham* court held—in that context—that the plaintiffs' diligence was insufficient; therefore, the plaintiffs' theory that the defendant's misrepresentations could lead to a class-wide finding regarding the level of due diligence required necessarily failed. *Id*. at 162.  This Court finds that the HUD-1s here are distinguishable from the more detailed and explanatory paperwork at issue in *Cunningham* related to reinsurance.

Emery then attempts to head off any argument that due diligence need not be established on an individual basis, because due diligence would have been futile.  It characterizes *Egerer,* 556 F.3d 415 (6th Cir. 2009) as rejecting the argument that a defendant's likelihood to lie if confronted with its misconduct would excuse the diligence requirement.  556 F.3d at 423.  The *Egerer* court rejected that argument, however, because testimony from an officer of the defendant therein did not support the conclusion that the defendant's officers would have lied if confronted.  *Id.* & n.16.  Here, there is evidence that—confronted with investigations into their conduct—certain Emery employees executed "sham" title services agreements.  (*See, e.g.,* Second Am. Mot. Class Cert. at Exs. 15(A)–15(D), Docs. 326-16–326-19 ("sham" title services agreements created between Genuine Tile and certain implicated Emery employees upon discovering the CFPD/CPD investigations); *id.* at PageID 11355–56, Doc. 326-1 (Plaintiffs' discussion thereof); *supra* note eight (testimony regarding, and copies of, "sham" title services agreements).)  Plaintiff also argues that Emery's failure to notify affected borrowers upon the initiation of the CFPB and CPD investigations represents concealment for purposes of the equitable tolling inquiry.  (Pls.' Reply at PageID 11878–79.)

Contrasted with these cases cited by Emery, the Court finds most persuasive the recent decision in *Fangman v. Genuine Title, LLC*, No. RBD-14-0081, 2016 WL 6600509 (D. Md. Nov. 8, 2016)—the case from which this action was severed.  The *Fangman* court certified a nearly identical class to that proposed here.[14]  Also dealing with multiple mortgage brokers and "sham" companies, which were involved in the same kickback scheme with the same title company as in issue here, the court concluded that "due diligence only requires investigation where 'an individual has been placed on inquiry notice of *wrongdoing*.'" *Id.* at *5 (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)); *see also Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 475–76 (6th Cir. 2013) ("We have noted that only information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence.") (quotation omitted).  In *Fangman*, the court concluded that the plaintiffs in that case had no inquiry notice of any wrongdoing due to actions that are also present in this case (*e.g.,* omission of kickbacks on the HUD-1s and the creation of "sham" companies for receipt of kickbacks).  2016 WL 6600509, at *6.  Therefore, because Plaintiffs have pointed to evidence suggesting Emery's fraudulent concealment of the kickback scheme, which affects all class members, the Court finds that individual issues do not predominate.

---

[14] The class certified in *Fangman* was defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C § 2602) from West Town Bank & Trust for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2009, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2014, was an employee, officer, member and/or agent of Defendants West Town Bank & Trust, Genuine Title LLC, Brandon Glickstein, Inc., Competitive Advantage Media Group LLC, and/or Dog Days Marketing, LLC.

*Fangman*, 2016 WL 6600509, at * 8.

Aside from case law, Emery cites the differing documents that purported class members received in connection with their closings that, it argues, could have put them on notice of RESPA violations—such documents varying depending on the given borrower.  (*See* Def.'s Opp'n at PageID 11355–56, Doc. 330.)  The Court does not find that this, however, disrupts a finding of predominance where Plaintiffs' proposed class definition is solely based upon HUD-1s.  Other documentation referring to affiliated business arrangements, disclaiming which service providers could be used, or confirming that a borrower carefully reviewed a HUD-1, do not change the fact that the face of the HUD-1s themselves did not give purported class members any reason to question or dispute amounts listed (or not listed) thereon.[15]

In *Egerer,* the Sixth Circuit based its denial of class certification, as related to equitable tolling in particular, on the existence of a disclosure that specifically indicated that a "business relationship existed between [the defendant realty company] and [the defendant title company], and that [the defendant realty company] may receive a 'financial or other benefit'" for their referral of business.  *Egerer*, 556 F.3d at 422.  Here, the closest that Emery comes to producing such a document is its reference to a "Business Relationship Disclosure" received by one putative class member.  (Def.'s Opp'n at Ex. 10, PageID 11391, Doc. 330)  This document states that WCS Lending, LLC, and not Emery, is a "Referring Party" to Genuine Title.  This document also has a line where the preparer is to check whether the lender's referral either "provides" or "does not provide" a financial benefit to the referring party.  Neither box is checked on this

---

[15] *See In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d at 403 (holding that the predominance requirement was met as to equitable tolling) ("HUD–1s that deviate from the requirements of [24 C.F.R. § 3500.8, transferred per 79 FR 34224-01 (June 16, 2014) to 12 C.F.R. § 1024.8] thus can be materially misleading because transmission of a HUD–1 impliedly warrants compliance with that section's specific requirements. We therefore conclude that inclusion of misleading information in a HUD–1 can constitute an independent act of concealment.").

particular form. The Court does not find that such a document would serve to trigger a heightened level of diligence as to the scheme between Genuine Title and Emery. In addition, the *Egerer* court declined to find a "requirement that defendants inform plaintiffs that they may have a legal claim because of defendants' business relationship." *Id.* at 423. But Plaintiffs do not argue that such a disclosure is lacking; instead, they argue that disclosure of the kickback payments on the HUD-1s is lacking.

Alert to the Sixth Circuit's instruction in *Egerer*, that the application of equitable tolling be narrowly and individually applied, the Court does not here hold that no fact-specific inquiry will be necessary. Nevertheless, the Court finds that the cases cited by Emery are distinguishable and that the issues identified by Plaintiffs regarding the kickback scheme and the active concealment thereof predominate over individual questions. To the extent that Plaintiffs are successful in demonstrating active concealment by Emery of its employees' alleged conduct, the Court envisions a more streamlined analysis of equitable tolling for putative class members.

### b. RESPA application and liability

Beyond the threshold question of equitable tolling, Emery raises several other potentially individualized issues that arise in the context of Plaintiffs' RESPA allegations. It argues that they weigh against the appropriateness of class treatment under the predominance inquiry. The Court addresses each issue in turn.

### i. RESPA application

Emery argues that a "federally related mortgage loan," as that term is used in the proposed class definition and defined in 12 U.S.C. § 2602, is not necessarily a RESPA-covered loan. In particular, RESPA expressly exempts from its coverage loans that are "primarily for

business, commercial, or agricultural purposes[.]"[16] 12 U.S.C. § 2606(a)(1). That inquiry, it argues, requires a case-by-case individualized inquiry regarding each loan.

Plaintiffs point to available documentation regarding the purported class members' loans as providing much of the information needed to determine whether a loan is covered by RESPA. (*See* Def.'s Opp'n Mem. Exs. 15–16, Doc. 330-15–330-16 (Emery data including loan type (*e.g.,* "cash out" or "no cash out" refinance) and collateral information (*e.g.*, primary residence or investor)); Pls.' Reply at Exs. 31–33, Doc. 333 (Veteran's Administration pamphlet excerpts discussing eligibility for applicable loan programs and for receiving "cash out" as being limited to loans with a consumer purpose).) To the extent that this would prove insufficient, the Court finds that the suggestion in *Spears v. First Am. eAppraiseIT*, No. 5-08-CV-00868, 2014 WL 4647697, at \*19 (N.D. Cal. Sept. 16, 2014)—the suggestion to employ a questionnaire for claimants regarding RESPA applicability—could be effective. While Emery cites one example of where this may prove ineffective due to inconsistent testimony by a putative class member, and speculates as to other reasons, the Court believes that this could be a simple and effective solution for a majority of the purported class members.

### ii.    Section 8(a) liability

Emery also argues that the question of liability under RESPA § 8(a) requires individual inquiry.[17] It relies, primarily, on *Wyman v. Park View Federal Savings Bank*, No. 1:09 CV 1851,

---

[16] Emery also cites an exemption for property of twenty-five or more acres. The regulation cited, 24 C.F.R. § 3500.5(b), has been transferred to 12 C.F.R. § 1024 *et seq.* in connection with the Dodd-Frank Act, Public Law 111-2013, 124 Stat. 1376, approved July 21, 2010. *See* 79 FR 34224-01, 2014 WL 2637011 (June 16, 2014). This exemption was removed. *See* 78 FR 79730-01, 2013 WL 6845310 (Dec. 31, 2013) ("The Bureau therefore exercises its authority under Dodd-Frank Act section 1032(a), RESPA section 19(a) and, for residential mortgage loans, Dodd-Frank Act section 1405(b) to eliminate the exemption for loans secured by property of 25 acres or more in § 1024.5(b)(1) of Regulation X."). To the extent this exemption would apply, the Court finds that a questionnaire to potential class members could dispose of this inquiry. *See infra* page 20. There are also other exemptions cited in 12 C.F.R. § 1024.5 either not raised or discussed in detail by the parties.

2010 WL 4868120 (N.D. Ohio Nov. 23, 2010), in which the court denied certification of a similar RESPA class.  In a one-paragraph analysis, the *Wyman* court concluded that "an individualized inquiry would be necessary to determine whether [defendant bank] referred each individual borrower to [defendant title company] for settlement services." *Id.* at *6.  The facts in *Wyman* centered on whether the defendants had an affiliated business arrangement[18]—as may be permissible under certain conditions according to 12 U.S.C. § 2607(c)(4).  Absent from *Wyman* are facts suggesting a culture wherein bank employees referred *every* loan to a particular title company pursuant to substantially similar kickback agreements between bank employees and that title company.  The Court finds that the lack of such ubiquitous alleged wrongdoing distinguishes *Wyman* from the facts at bar.

Emery also cites deposition testimony from Emery employee Mandelberg, in which he recalls one borrower who had chosen Genuine Title prior to him making the referral.  The referral required for purposes of the RESPA statue, however, does not necessarily need to be the sole reason that a particular title company is chosen.  According to RESPA regulations, a referral "includes any oral or written action directed to a person which has the effect of *affirmatively influencing* the selection by any person of a provider of a settlement service[.]" 12 C.F.R. §

---

[17] Section 8(a) reads: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

[18] An "affiliated business arrangement" is defined as:

> an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider[.]

12 U.S.C. § 2602(7).

1024.14(f) (emphasis added).  For this reason, the Court does not view this instance as dispositive of whether a referral was made over the class-wide inquiry urged by Plaintiffs.

As to the requirement that a "fee, kickback, or thing of value" be exchanged for the referral, Emery argues, again, that this inquiry must be made on a loan-by-loan basis.  12 U.S.C. § 2607(a).  Without foreclosing the possibility that individual inquiry could be necessary, the Court is convinced that there are class-wide issues that could be relevant to this and to the referral element of RESPA liability.  For example, Zukenberg testified that there were no loans offered by Emery that were not eligible for kickbacks from Genuine Title in exchange for referrals, which seems highly relevant to whether each and every class member would have been affected by an actual referral in exchange for a kickback.  (Zukerberg Dep. 52:6–10 at PageID 6217, Doc. 300.)

Discussing the use of circumstantial evidence, Emery points out that RESPA regulations only cite "practice, pattern or course of conduct" evidence in the specific context of demonstrating an "agreement" to pay kickbacks. 12 C.F.R. 1024.14(e).  This does not, however, establish that such evidence is irrelevant or prohibited with respect to other elements of RESPA liability, as Emery suggests.  The Court is likewise not persuaded by Emery's citation to *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979 (6th Cir. 2009).[19]  The quoted language comes in the context of that court's discussion of Article III standing, where it concluded that the plaintiffs

---

[19] Emery argues:

> RESPA "creates an **individual right** to receive referral services untainted by kickbacks or fee-splitting." *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 989 (6th Cir. 2009) (emphasis added); *id.* (the violation "must cause individual, rather than collective, harm"). "RESPA . . . authorizes suits only by individuals who receive a loan that is accompanied by an **unlawful referral**, which is plainly an **individualized injury**." *Id.* (emphasis added).

(Def.'s Opp'n at PageID 11364.)

23

had alleged individual—not collective—harm. *Id.* at 989. The Court finds that this case is neither necessarily in conflict with Plaintiffs' position here, nor instructive regarding evidentiary or class certification requirements in a RESPA action.

Emery further notes that not all of Genuine Title's business came from referral agreements—certain states being subject to "workshare agreements" for which referral payments were not made. (Def.'s Opp'n at PageID 11366.) In the event that Plaintiffs can prove the widespread kickback scheme alleged, the determination of those particular Emery branches that did not participate is not likely to overwhelm the proceedings.[20]

### iii. Section 8(b) liability

Emery next argues that Plaintiffs have not sufficiently articulated their § 8(b) claims.[21] In particular, they argue that § 8(a) and § 8(b) cover distinct conduct and that Plaintiffs have only alleged conduct violating § 8(a). Emery cites *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 636, 132 S. Ct. 2034, 2043 (2012) for its observation that "each subsection reaches conduct that the other does not[.]" The *Freeman* case does not hold, however, that a defendant cannot be guilty of both types of conduct. In *Freeman*, petitioners sought a determination that the respondent could be held liable under § 8(b) even though the respondent kept 100 percent of the unearned fee and did not split it with another entity. Here, by contrast, Plaintiffs argue that Emery both received kickbacks *and* accepted a "portion, split, or percentage" of Genuine Title's

---

[20] At the oral argument held July 18, 2017, Plaintiffs' counsel represented that he was aware of only one Matched Class Loan from a "workshare agreement" state.

[21] Section § 8(b) reads: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

settlement service changes.  There is evidence in the record to support the regular splitting of fees between Genuine Title and Emery employees.[22]

### iv.      Section 8(c)(2)'s safe harbor

Emery cites Klopp's testimony for its contention that an individualized inquiry is also necessary as to the availability of RESPA's safe harbor under § 8(c)(2).[23]  He testified that he performed at least some form of title services for each loan that he referred to Genuine Title in exchange for the referral fee.[24]  Emery argues that the inquiry that follows naturally from this testimony—whether the services were compensable and, if so, whether the fees paid were reasonable—requires a loan-by-loan analysis.  Because Klopp was involved in a significant

---

[22] The Court refers here to Zukerberg's deposition testimony that is cited in Defendant's Opposition.  (Doc. 330 at PageID 11367.)  Contrasted with Defendant's characterization thereof, the Court finds that it supports the inference that fees were routinely split between Genuine Title and Emery employees—whether by a formula or by a flat amount of each fee charged by Genuine Title.  To the extent that not all Emery employees are discussed in that part of the deposition, this does not foreclose the possibility that all alleged kickbacks were paid from some portion (flat amount or otherwise) of the fees generated by Genuine Title.

[23] Section 8(c)(2) reads: "Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed."

[24] Specifically, Klopp testified:

> A.   So we provided services for Genuine Title.
> . . .
>
> Q. . . . What percentage of loans on which Carroll Abstracts was paid by Genuine Title did Carroll Abstracts performed services for Genuine Title?
>
> A. Well, on every loan we provided a payout.

(Klopp Dep. 77:4–5, 10–15 at Page ID 7864, Doc. 307; *see also id.*, 128:7–18 at PageID 7877 (Klopp testifying that he "provide[d] services for [the referral fee].").)

portion of the putative class members' loans,[25] Emery argues that this inquiry would overwhelm the proceedings.

Klopp also concedes in his testimony, however, that "[he was] paid on every single loan across the board, regardless of whether any services were performed or not."  (Klopp Dep. at 77:5–7 at PageID 7864, Doc. 307.)   He also testifies: "[I]f [he] didn't refer the deal to Genuine Title, [he] wouldn't get the $400.  Yet [he] still may be required to perform the services."  (*Id.* at 142:2–5, PageID 7881.)  Further, Genuine Title president, Jay Zukerberg, stated in his affidavit that neither those who made referrals in exchange for marketing credit nor those who made referrals in exchange for cash "provided any title services associated with [those kickbacks]." (Second Am. Mot. Class Cert. at Ex. 3, PageID 10494, Doc. 326-4; *see also id.* at Ex. 17, Tabor Aff. ¶ 9, PageID 11077, Doc. 326-21 ("The Marketing Credits that Emery . . . received were solely for the referral of Emery borrowers and loans and were not related to any actual settlement services provided by me or any Emery employee.").)

Emery cites *Kiefaber v. HMS National, Inc.*, 891 F. Supp. 2d 796, 798 (E.D. Va. 2012), to support its argument that individualized inquiry is necessary to evaluate whether the § 8(c)(2) safe harbor applies to Klopp on each loan that he closed.  In *Kiefaber*, a case considering whether kicking back a portion of a home warranty service fee to the referring real estate company was covered by this same safe harbor, the court looked to the "Warranty Rule"[26] for guidance on whether the kickbacks at issue were for "compensable services."  *Id*. at 798–800.

---

[25] At the oral argument held July 18, 2017, the parties estimated between 1,200 and 2,000 loans closed by Klopp in this putative class.

[26] This rule is derived from a HUD interpretive rule.  *See* Home Warranty Companies' Payments to Real Estate Brokers and Agents, 75 Fed.Reg. 36,271 (June 25, 2010). The "Warranty Rule" provides that compensable services are only those that are "(1) actual, (2) necessary and (3) distinct from the primary services provided by the real estate broker or agent, (4) that are not nominal, and (5) for which duplicative fees are not charged."  *Kiefaber*, 891 F. Supp. 2d at 799.

Emery argues that this multi-faceted inquiry would drive an overwhelming number of mini-trials in this case.  The *Kiefaber* opinion, however, calls into question the applicability of the "Warranty Rule" following the *Freeman* Supreme Court decision, which was decided after the oral argument in that case.  *Kiefaber*, 891 F. Supp. 2d at 800 n.6.  In particular, *Kiefaber* calls the "reasonable" aspect of the "Warranty Rule's" inquiry "glaringly inconsistent" with *Freeman*.[27] *Id.*

Emery also cites *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003), for its holding that determining the reasonableness of the kickbacks versus the actual services provided requires loan-by-loan inquiry.  *Id.* at 742.   In *O'Sullivan*, however, the plaintiffs conceded that the defendant had "performed some services."  *O'Sullivan*, 319 F.3d at 741.  No such concession is made here.

Relieved of an inquiry into the reasonableness of the alleged services provided, as suggested in *Kiefaber*, and in view of the factual distinction with *O'Sullivan*, the inquiry begins to look more binary than multi-faceted.  At least one court of appeals has concluded that where the question is one of whether any title services *at all* were provided in exchange for kickbacks, as opposed to whether the fees for title services were compensable, then there is a sufficiently "binary and predominant" inquiry for purposes of class review.  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1325–26 (11th Cir. 2008).

In view of the foregoing, at this stage in the litigation, the Court concludes that the questions of RESPA application and liability are appropriate for class treatment.  As the case progresses, should this conclusion prove no longer appropriate, the Court may alter, amend, or

---

[27] The *Freeman* opinion dismisses HUD regulations regarding the reasonableness of fees as inconsistent with RESPA, which clearly "does not reach unreasonably high fees."  *Freeman*, 132 S. Ct. at 2040.

tailor this Order—including decertification of the class.  Fed. R. Civ. P. 23(c)(1)(C), (c)(4), (c)(5).

### 2.  Superiority

Rule 23(b)(3) includes a non-exhaustive list of factors to be considered in determining the superiority of proceeding as a class action compared with other methods of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Other courts confronted with proposed RESPA classes, including some within the Sixth Circuit, have declined to certify such actions on the basis that they do not satisfy this requirement—in particular, that the fee shifting and treble damage provisions in the RESPA statute prohibit the finding that a class action is superior to individual suits.  *See, e.g., Carter*, 2010 WL 908464, at *2 (collecting cases).

The Sixth Circuit, however, has not definitively ruled on this.  The court in *Powers v. Fifth Third Mortgage. Co.*, No. 1:09-cv-2059, 2011 WL 3811129 (N.D. Ohio Aug. 12, 2011), provides a helpful summary of the guidance that the Sixth Circuit *has* provided:

> The Sixth Circuit has not ruled on the issue of whether RESPA's financial incentives make RESPA claims inappropriate for class actions. In *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002), a case brought pursuant to the Equal Credit Opportunity Act, the court observed that "class treatment of claims is most appropriate where it is not "economically feasible" for individuals to pursue their own claims." 296 F.3d at 449. In a case involving alleged violations of TILA, however, the Sixth Circuit made the following observations:

> We are ... aware that the technical nature of the violations may well argue in favor of the appropriateness of the class action here. Precisely because the violations are technical, as appellant notes, most of the members of the consumer class will not be aware of them unless they should encounter a practicing attorney versed in the Act. The superiority of the class action in these circumstances lies in the fact that the class members may share in a financial recovery which, otherwise, they would never pursue on their own behalf because of ignorance.
>
> Additionally, the class action provides an opportunity to educate a segment of the public, those included in the class, of the obligations which creditors owe to them as credit consumers. This mass awakening of awareness could, indeed, be the greatest single benefit derived in an area of regulation in which the responsibility of policing falls principally on the shoulders of the private citizen and private counsel.
>
> *Watkins v. Simmons and Clark, Inc.*, 618 F.2d 398, 403–04 (6th Cir. 1980). As these observations apply with equal force to most RESPA cases, including the present case, it cannot be said that the Sixth Circuit has provided clear guidance on the issue of whether RESPA claims are suitable for class action.

*Id.* at *19–20. The *Powers* court ultimately determined that individual inquiries in the case before it outweighed the potential benefits of class treatment—in particular, determining the application of RESPA to each individual loan. *Id.* In *Powers*, however, the putative class had between 15,000 and 17,000 members, and "the information maintained by defendants [was] insufficient to determine whether the vast majority of potential class members [were] covered by RESPA." *Id.* at *19. That does not appear to be the case here. (*See* Def.'s Opp'n Mem. Exs. 15–16, Doc. 330 (Emery data including loan type and occupancy information); Pls.' Reply Exs. 31–33, Doc. 33 (Veteran's Administration pamphlet excerpts discussing eligibility for applicable loan programs and for "cash out"); *supra* page 20 (discussing the potential use of a class member questionnaire).)

The Court is convinced that the predominance of common issues and the efficiencies achieved by trying such issues in one proceeding make certification of this class superior to maintaining

separate actions.  While certain Sixth Circuit precedent suggests that statutes providing financial incentives for private action may weigh against class treatment, the Court does not find that this avenue has been foreclosed, as explained in *Powers*.  Based upon the allegations and evidence before it, the Court finds that the widespread, purposefully concealed scheme between Genuine Title and Emery is well-suited for class adjudication.

## IV.    CONCLUSION

The Court finds that Plaintiffs have easily satisfied their burden under Rule 23(a).  While Rule 23(b) requires a substantially more difficult showing, the Court is simply not persuaded that the potential for some individualized inquiry predominates over the overarching and consistent conduct by Emery to carry out and cover up the kickback scheme alleged in this case.

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' Second Amended Motion for Class Certification (Doc. 326-1).  The Court is cognizant of its prerogative to alter, amend, or otherwise tailor this Order prior to final judgment; or to decertify the class should the class prove unmanageable or overwhelmed by individual issues as it progresses.  Fed. R. Civ. P. 23(c)(1)(C), (c)(4), (c)(5).

**IT IS SO ORDERED.**

Dated:  _8/10/17____                          s/Susan J. Dlott____
                                             Judge Susan J. Dlott
                                             United States District Court