**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | |
|---|---|
| FRANK A. AND SHELLY PALOMBARO, JR., *et al.*, | : |
| | : CASE NO. 1:15-cv-792-SJD |
| Plaintiffs, | : |
| | : Judge Susan J. Dlott |
| | : Magistrate Judge Karen L. Litkovitz |
| v. | : |
| | : |
| EMERY FEDERAL CREDIT UNION, | : |
| | : |
| Defendant. | : |
| | : |

**CLASS COUNSEL'S AND CLASS REPRESENTATIVES'**
**UNOPPOSED PETITION FOR ATTORNEYS' FEES AND EXPENSES**
**AND FOR CLASS REPRESENTATIVES' SERVICE AWARDS**
**FOR EMERY FEDERAL CREDIT UNION SETTLEMENT**

Pursuant to Fed. R. Civ. P. 23 and this Court's Order Granting Preliminary Approval of Class Action Settlement (ECF Doc. #344), Class Counsel and Class Representatives hereby submit their Unopposed Petition for Attorneys' Fees and Expenses and Class Representatives' Service Awards for Emery Federal Credit Union Settlement. The reasons for this Petition are set forth in the attached Memorandum in Support.

Respectfully submitted,

*/s/ Gregory M. Utter*
Gregory M. Utter (0032528)
Melissa A. Schaub (0093352)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH 45202
Phone: (513) 579-6540
Fax: (513) 579-6457
gmutter@kmklaw.com
mschaub@kmklaw.com

/s/ Michael Paul Smith
Michael Paul Smith (*admitted pro hac vice*)
Melissa L. English (*admitted pro hac vice*)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD  21204
Phone:  (410) 821-0070
Fax:  (410) 821-0071
mpsmith@sgs-law.com
menglish@sgs-law.com

/s/ Timothy F. Maloney
Timothy F. Maloney (*admitted pro hac vice*)
Veronica B. Nannis (*admitted pro hac vice*)
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
Phone:  (301) 220-2200
Fax:     (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify this 11th day of May, 2018, that copies of the foregoing were served via the CM/ECF system to all counsel of record.

/s/ Gregory M. Utter
Gregory M. Utter

2

**MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S AND CLASS
REPRESENTATIVES' UNOPPOSED PETITION FOR ATTORNEYS' FEES
AND EXPENSES AND FOR CLASS REPRESENTATIVES' SERVICE AWARDS
<u>FOR EMERY FEDERAL CREDIT UNION SETTLEMENT</u>**

Class Counsel and Class Representatives hereby submit their Memorandum in Support of

their Unopposed Petition for Attorneys' Fees and Expenses and Class Representatives' Service

Awards for Emery Federal Credit Union Settlement.

## COMBINED TABLE OF CONTENTS AND SUMMARY

I.  INTRODUCTION..........................................................................................................1

Under the Settlement Agreement Class Counsel seek (1) attorneys' fees in the amount of 30% of the Common Fund, or $2,700,000; (2) expenses in the amount of $81,450.31; and (3) Service Awards of $5,000 to each Class Representative.

II.  LAW AND ARGUMENT.................................................................................................3

    A.  **Class Counsel's Request for Attorneys' Fees and Expenses is Reasonable Under the Percentage of the Fund Method** ...............................................................4

Class Counsel's requested percentage of the fund, confirmed by the lodestar cross check, is fair and reasonable under the six factors set forth in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).

    1.  **The Value of the Benefit Rendered to the Class**......................................4

Class Counsel obtained a substantial, maximized and collectible benefit for the Emery Class. The perceived value of the benefit to the Emery Class may be inferred from the notice to borrowers on 5,290 Emery loans generating no objections to the Settlement Agreement and a single request for exclusion.

    2.  **Society's Stake in Rewarding Attorneys Who Produce Benefits for the Class** ...................................................................................6

It is unlikely that all 5,289 Emery Class Members would or could have individually obtained the recovery achieved by Class Counsel. Class Counsel's requested percentage of the fund is sufficient to attract competent counsel to RESPA cases without producing a windfall, and serves society's interest in advancing RESPA enforcement and compliance.

    3.  **Whether the Services Were Undertaken on a Contingent Basis**...........8

Class Counsel litigated this case on a contingent basis and invested substantial resources with the significant risk of an unsuccessful outcome and no fee award. This case was additionally burdened by the unique regulatory risk of Emery's almost certain liquidation on a successful result at trial.  Class Counsel's carrying of this risk and the substantial, maximized and collectible result obtained support the requested percentage of the fund.

    4.  **The Value of the Services on an Hourly Basis**........................................8

Under the fourth *Ramey* factor, the Court examines the value of the attorneys' services on an hourly basis by performing the "lodestar" cross-check. Class Counsel's total lodestar amount is $1,544,247.00 and the requested percentage of the fund yields a 1.75 lodestar cross-check multiplier which is within the range of multipliers this Court and others in this circuit have found reasonable. *Lowther v. AK Steel Corp.,* No. 1:11-CV-877, 2012

WL 6676131, at 1-2 (S.D. Ohio Dec. 21, 2012). Class Counsel requests reimbursement of $81,450.31 in expenses which are reasonable and were necessary to provide a benefit to the Emery Class.

5.    **The Complexity of the Litigation**............................................................16

The complexity of this litigation was different in kind and scope from the companion litigation in Maryland and supports the requested percentage of the fund. Three challenges in particular support the requested percentage of the fund: (1) gathering evidence on Emery's vast mortgage division with 27 loan production offices and more than 400 loan officers scattered across 12 states; (2) breaking new legal and evidentiary ground to carry Plaintiffs' burden on class certification in light of the large Emery Class size; and (3) resolving regulatory and insurance issues of first impression to get to settlement.

6.    **The Professional Skill and Standing of Counsel on Both Sides**...........22

Both Class and Emery's Counsel are highly regarded attorneys experienced in complex commercial litigation and class actions.

**B.  Class Representatives' Request for Service Awards is Reasonable**......................23

Each Class Representative requests a $5,000 Service Award as permitted by the Settlement Agreement. The Class Representatives substantial and sustained participation in the litigation was integral to achieving settlement and obtaining Settlement Benefits for the Emery Class, and support the requested Service Awards.

**III.    CONCLUSION** ...............................................................................................25

Class Counsel respectfully request the Court grant the unopposed petition with an award of attorney fees in the amount of 30% of the Common Fund, plus reasonable expenses, and a $5,000 Service Award to each Class Representative, for the importance of their participation in the litigation and settlement.

# TABLE OF AUTHORITIES

Cases

*Basile v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,
    640 F. Supp. 697, 702 (S.D. Ohio 1986) ...........................................................................7

*Bower v. MetLife, Inc.*,
    No. 1:09-cv-351, 2012 WL 12991199 at 7-8 (S.D. Ohio Oct. 17, 2012) ...................14, 25

*City of Plantation Police Officers' Employees' Retirement System v. Jeffries*,
    No. 2:14-CV-1380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) .................................14

*Connectivity Sys. Inc. v. Natl. City Bank*,
    No. 2:08-CV-1119, 2011 WL 292008 (S.D. Ohio Jan. 26, 2011) .............................14, 15

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*,
    137 F.R.D. 240, 250 (S.D. Ohio 1991) ...........................................................................14

*Estep v. Blackwell*,
    No. 1:06-cv-106, 2006 WL 3469569  (S.D. Ohio Nov. 28, 2006) ...................................23

*Feiertag v. DDP Holdings, LLC*,
    No. 14-CV-2643, 2016 WL 4721208  (S.D. Ohio Sept. 9, 2016) .......................................8

*Gentrup v. Renovo Serv., LLC*,
    No. 1:07CV430, 2011 WL 2532922 (S.D. Ohio June 24, 2011)........................................8

*Hadix v. Johnson,* 322 F.3d 895 (6th Cir. 2003)........................................................................24

*In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369 (S.D. Ohio 2006) ...........................................8

*In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) .............8, 9, 10, 15

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
    130 F.R.D. 366 (S.D. Ohio 1990) .................................................................................4, 8

*In re Nationwide Fin. Servs. Litig.*,
    No. 2:08-CV-00249, 2009 WL 8747486 (S.D. Ohio Aug. 19, 2009) ..........................4, 14

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*,
    268 F. Supp. 2d 907 (N.D. Ohio June 12, 2003) ..........................................................5, 6

*In re: Whirlpool Corp. Front–Loading Washer Prod. Liab. Litig.*,
    No. 1:08-WP-65000, 2016 WL 5338012 (N.D. Ohio Sept. 23, 2016) .............................24

iv

*Johnson v. Midwest Logistics Sys. Ltd.*,
    No. 2:11-CV-1061, 2013 WL 2295880 (S.D. Ohio May 24, 2013)..................................24

*Lonardo v. Travelers Indem. Co.*,
    706 F. Supp. 2d 766 (N.D. Ohio March 31, 2010) ............................................................4

*Lowther v. AK Steel Corp.*,
    No. 1:11-CV-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012)................... ii, 7, 14, 23

*Michel v. WM Healthcare Solutions, Inc.*,
    No. 1:10-CV-638, 2014 WL 497031 (S.D. Ohio Feb. 7, 2014) ...........................3, 7, 9, 14

*Moore v. Aerotek, Inc*,
    No. 2:15-CV-2701, 2017 WL 2838148  (S.D. Ohio June 30, 2017)...................................4

*Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268 (N.D. Ohio 2006)...............................20 n.15

*Powers v. Fifth Third Mortg. Co.*,
    No. 1:09-cv-2059, 2011 WL 3811129 (N.D. Ohio Aug. 12, 2011)...........................20 n.15

*Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir. 1974) .......................................... i, 1

*Rawlings v. Prudential-Bache Props., Inc*., 9 F.3d 513 (6th Cir. 1993).......................................3

*Smilie v. Park Chem. Co.*, 710 F. 2d 271 (6th Cir. 1983)............................................................23

*Toldy v. Fifth Third Mortg. Co.*,
    No. 1:09-CV-377, 2011 WL 4634154 (N.D. Ohio Sep. 30, 2011)...........................20 n.15

*Van Horn v. Nationwide Prop. and Cas. Ins. Co*.,
    436 F. App'x 496 (6th Cir. 2011)  ...........................................................................3, 5 n.2

*Underwood v. Carpenters Pension Trust Fund-Detroit and Vicinity*,
    No. 13-CV-14464, 2017 WL 655622 (E.D. Mich. Feb. 17, 2017)....................................15

*Vigna v. Emery Fed. Credit Union*,
    No. 1:15-CV-51, 2016 WL 7034237 (S.D. Ohio Dec. 2, 2016)...................3, 4, 7, 8, 9 n.7

<u>Statutes and Regulations</u>

12 U.S.C. §2607(d)(2) ...............................................................................................................7

12 U.S.C. §2607(d)(5) ...............................................................................................................3

12. C.F.R. §702.21, *et. seq.* .......................................................................................................5

12 C.F.R. §713.3-713.6. ...........................................................................................................22

<u>Rules</u>

Fed. R. Civ. P. 23(e) ......................................................................................................1

Fed. R. Civ. P. 23(h) .......................................................................................................3

Fed. R. Civ. P. 54(d)(2)...................................................................................................1

## I.    INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 23(e) and 54(d)(2) and the Court's Order Granting Preliminary Approval of Class Action Settlement (Doc. #344), Class Representatives Frank and Shelly Palombaro, Kevin and Jennifer McAlpin, Gary Ratcliff, and David and Melinda Alvarado, and undersigned Class Counsel submit this Memorandum of Law in support of their Unopposed Petition for Attorneys' Fees and Expenses and Class Representatives' Service Awards for the Emery Federal Credit Union ("Emery") Settlement.

Under the Settlement Agreement, which was preliminarily approved by the Court (*see* Doc. #344), this Petition seeks (1) attorneys' fees in the amount of 30% of the Common Fund, or $2,700,000, which yields a 1.75 lodestar cross-check multiplier[1]; (2) reimbursement of expenses incurred; and (3) Service Awards of $5,000 to each Class Representative.  As detailed below, the requested attorneys' fees and expenses are fair and reasonable under the percentage of the fund method confirmed by a lodestar cross-check and each and all of the factors set forth in *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)*.*

Settlement of a contested case can color the prior proceedings with the tint of inevitability, but the results achieved in this case were anything but inevitable. Unlike the very small lender, West Town Bank & Trust, that remained through class certification in the related Maryland litigation, Emery Federal Credit Union was "the big dog" in the Genuine Title Kickback Scheme in both size and scope of participation:  Emery's mortgage division had 27 loan production offices across the United States with more than 400 mortgage brokers, and 13 of

---

[1] Class Counsel have attached the declarations of Class Counsel Michael Paul Smith of Smith, Gildea & Schmidt, LLC (the "Smith Declaration"); Veronica Nannis of Joseph, Greenwald & Laake, P.A. (the "Nannis Declaration"); and Gregory Utter of Keating Muething & Klekamp PLL (the "Utter Declaration") as **Exhibits 1**, **2**, and **3**, respectively.  These declarations and supporting entries, redacted for privilege, identify the following information: (1) the hours and expenses specifically attributable to Emery through the preparation of the instant Petition and the fees estimated to be incurred following the filing of the Petition through settlement administration, and (2) the proportionate share of hours and expenses attributable to Emery through December 12, 2015 (the date the matter was ordered transferred to this Court)  for lodestar cross-check purposes, discussed *infra*, n.9.

those offices and more than 250 of those brokers participated in the Genuine Title Kickback Scheme collecting kickbacks on more than 5,000 Emery brokered loans. Emery pushed this litigation to this Court and all the way to class certification likely gambling on the fact that in the Sixth Circuit no RESPA plaintiffs had been able to build a case for class certification, and in declining to certify similar RESPA classes, some courts in the Circuit had intimated that it might not be possible to do so. Emery leveraged the closure of its mortgage division in 2014 to stonewall discovery and claim, until intervention by the Court, that it no longer had records related to the time period of the Kickback Scheme.

Despite these obstacles, Class Counsel came to class certification with a merits case, able to identify the Emery Class with particularity and, as to the kickbacks, show the Court exactly "who got and gave what, how much and when." Doc. #325, Pls. 2d Am. Mot. for Class Certification, PageID9547. This substantial evidence against Emery was painstakingly collected in this case – not the Maryland action – in the limited time for pre-certification discovery. The Emery Class was built by Class Counsel integrating two massive databases and individual public land records research across more than 25 states. Class Counsel married this data with sophisticated regulatory interpretation and statistical analysis to demonstrate that large RESPA classes can in fact meet Rule 23 requirements without extensive individualized inquiry. Class Counsel's effort and groundbreaking analysis made possible the certification of the Emery Class.

The Settlement Benefits obtained for the Emery Class in particular justify the requested fees. Each Emery class member will receive more than $1,000 and more than a majority of the title and settlement service costs associated with the borrower's Emery loan. Class Counsel specifically negotiated maximum benefits for the Emery Class with the lowest risk that Emery would be forced into conservatorship or liquidation (and thereby escape all liability to the Emery

Class), as well as a "direct pay" settlement to ensure that the greatest number of Emery borrowers received Settlement Benefits. In short, Class Counsel made an unprecedented effort and obtained the maximum benefit for the lowest risk to Emery Class. The requested fees and expenses should be granted.

Service Awards of $5,000 for each of the Class Representatives in this case are also fair and reasonable. Without the efforts of the Class Representatives, in responding to discovery requests, attending depositions and hearings, and participating in settlement negotiations, a Settlement could not have been reached in this matter and the Common Fund would not have been created for the benefit of the Emery Class. For these reasons, and because the requested Services Awards are within the range typically awarded in this circuit, the Court should grant the Class Representatives' request.

## II. LAW AND ARGUMENT

Both RESPA and Federal Rule of Civil Procedure 23 expressly allow recovery of "reasonable" attorneys' fees and expenses in a certified class action. 12 U.S.C. §2607(d)(5); Fed. R. Civ. P. 23(h). "In common-fund cases, the award of attorney's fees need only 'be reasonable under the circumstances.'" *Michel v. WM Healthcare Solutions, Inc.*, No. 1:10-CV-638, 2014 WL 497031, at *13 (S.D. Ohio Feb. 7, 2014). (citing *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).

In considering reasonableness of attorneys' fees awards, "[t]he Sixth Circuit has approved both the 'lodestar' and percentage of the fund method of payment of attorneys' fees." *Vigna v. Emery Fed. Credit Union*, No. 1:15-CV-51, 2016 WL 7034237, at *4 (S.D. Ohio Dec. 2, 2016) (citing *Rawlings*, 9 F.3d at 515-16 (6th Cir. 1993)). This Court often has found that the

3

most appropriate method is "to award a reasonable percentage of the fund with reference to the lodestar and resulting multiplier." *Id.* The percentage of the fund is simply a percentage of the common fund, "with the percentages awarded typically ranging from 20 to 50 percent[.]" *Moore v. Aerotek, Inc*, No. 2:15-CV-2701, 2017 WL 2838148, at *6 (S.D. Ohio June 30, 2017) (citing *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 372 (S.D. Ohio 1990)).

### A. Class Counsel's Request for Attorneys' Fees and Expenses is Reasonable Under the Percentage of the Fund Method.

In considering the reasonableness of the fee award under the percentage of the fund method, the Court considers the six *Ramey* factors, all of which confirm that Class Counsel's requests for attorneys' fees, costs, and expenses are reasonable and well within the range approved in similar class actions.

### 1. The Value of the Benefit Rendered to the Class

As explained in Plaintiffs' Motion for Preliminary Approval of the Settlement, Class Counsel achieved a significant recovery for the Emery Class. The members of the Emery Class will recover from Emery approximately $1,160 per loan, an amount which far exceeds a nominal sum and is equal to nearly 65% of the title and settlement charges related to their Emery loan. *Compare Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 780 (N.D. Ohio March 31, 2010) (settlement recovery of $36 per class member representing 20% of actual damages is a "meaningful recovery" supporting reasonableness of requested fees) *and In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at 14 (S.D. Ohio Aug. 19, 2009) ($5.05 increase in final offer share price and additional proxy disclosures "substantial" benefits to class supporting reasonableness of 2.46 lodestar multiplier). The gross value of the Settlement Benefits is augmented by the direct pay structure specifically negotiated by Class Counsel designed to deliver Settlement Benefits without the need for class members to file a claim or take

4

any additional action.[2]  The direct pay structure means that class members will incur no additional time, documentation, or expense to access the Settlement Benefits and ensures the greatest number of class members will receive the Settlement Benefits.

The benefit Class Counsel obtained for the Emery Class is also substantial because it is collectible. Emery's regulator, the National Credit Union Administration ("NCUA"), has broad discretion to take regulatory action when a federal credit union becomes, or threatens to become, undercapitalized, including the authority to place the credit union into conservatorship and/or liquidation and to allow the credit union to walk away from its legal obligations. *See* 12 C.F.R. § 702.201, *et seq.*  Given the size of the Emery Class and RESPA's statutory measure of treble damages, a successful result at trial almost certainly would have precipitated Emery's liquidation, effectively nullifying any recovery by the Emery Class.[3] The Settlement enhances the benefit obtained for the Emery Class beyond the face value of the benefit in that it forecloses the probability that the Emery Class would be left with the pyrrhic victory of a substantial but uncollectible judgment. *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 931 (N.D. Ohio June 12, 2003) (settlement guaranteeing recovery for class members in face of probable bankruptcy of medical device company was a separate, valuable benefit to the class strongly supporting fee award).

---

[2]  Class Counsel refused Emery's request for a "claims made" settlement structure because, in Class Counsel's experience, fewer than 20% of eligible class members typically complete the claims process necessary to receive benefits, and, as courts in the Sixth Circuit have recognized, radically reduces the benefit of a settlement to class members. *See, e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, No. 1:08-CV-605, 2010 WL 1751995 at 6 (N.D. Ohio Apr. 30, 2010) (agreement to a claims made settlement does not support requested fees because it "'regularly yield[s] response rates of 10 percent or less.'")(citations omitted).

[3] Emery admitted that this was the likely course of action in its petition to the Sixth Circuit for permission to appeal the Emery Class certification order.  In its petition,  Emery told the Sixth Circuit that should Plaintiffs go to trial and prevail on the merits, Emery's financial condition would raise serious concerns regarding collectability and a full judgment on the class's RESPA claims would have likely led to a conservatorship and/or liquidation. *Emery Fed. Credit Union v. Palombaro*, No. 17-309, Doc. #1, Pet. for Leave to File App. of Class Certification Order at 10-11 (6th Cir. Aug.  24, 2017).

In addition, Class Counsel engaged Robert Browne, a financial institutions expert who reviewed multiple years of Emery's regulatory and financial filings, performed capitalization calculations under multiple regulatory measures, and provided Class Counsel with expert opinions on the range of settlements that Class Counsel could advocate for during settlement negotiations to obtain the greatest recovery for the Emery Class while avoiding triggering any regulatory action from the NCUA. *See* Ex. 1, ¶ 28. Based on Browne's calculations and expert opinions, Class Counsel believe that $9,000,000 is the **maximum amount** that could be obtained without substantial risk that the NCUA would take adverse action and threaten recovery to the Emery Class. *Id.* Therefore, the Emery Class has received the additional benefit of a maximized recovery with the lowest regulatory risk. *In re Sulzer,* 268 F. Supp at 931 (record documenting class counsel's expert's analysis of defendants' financial circumstances to ensure defendants would 'suffer the maximum judgment they can withstand'" is a substantial benefit to class members supporting reasonableness of requested fees).

The value of the benefit to the class is widely regarded as the most important of the six *Ramey* factors and it is strongly supported here because Class Counsel obtained a substantial, maximized and collectible benefit for the Emery Class.

### 2.      Society's Stake in Rewarding Attorneys Who Produce Benefits for the Class

The second *Ramey* factor considers society's stake in rewarding attorneys who produce benefits for the class, in order to provide an incentive to attract competent counsel.  *Ramey*, 508 F.2d at 1196. The present lawsuit has provided a vehicle for 5,289[4] Emery Class Members, "many of whom may have lacked the motivation or resources to pursue their claims individually", who will now recover from Emery for its participation in the illegal kickback

---

[4] Class Counsel identified 5,290 class loans which make up the Emery Class.  One member of the Emery Class has opted out of the Settlement.

scheme. *Vigna*, No. 1:15-CV-51, 2016 WL 7034237, at *4. In other words, Class Counsel achieved results for the Emery Class that almost certainly would not have been achieved on an individual basis. *Lowther v. AK Steel Corp.,* No. 1:11-CV-877, 2012 WL 6676131, at *3 (S.D. Ohio Dec. 21, 2012) ("Absent a class action, small individual claimants would lack the resources to litigate a case of this magnitude."). As this Court has explained, "a reasonable award of attorneys' fees is one that is adequate to attract competent counsel, but does not produce a windfall to attorneys." *Michel,* No. 1:10-CV-638, 2014 WL 497031, at *16. The requested percentage of the fund in this case strikes the right balance between these two considerations.

In addition, the $1,160 benefit for each class member represents a cost to Emery many times the value of the kickback Emery received related to the loan, and an amount higher than the profit Emery realized from the loan.[5] In imposing costs on Emery for its illegal conduct, Class Counsel provided the additional societal benefit of enforcement of federal RESPA law, a result plainly intended by Congress' provision for private rights of action under 12 U.S.C. §2607(d)(2). Reasonable attorney fees awards in cases like these encourages and supports other RESPA prosecutions and advances RESPA enforcement and compliance. *Lowther,* No. 1:11-CV-877, 2012 WL 6676131, at *3 (requested fee award in ERISA private right of action is supported by "important public policy considerations" because private lawsuits are "essential to effectuate" remedial purpose and enforcement of federal laws); *Basile v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 640 F. Supp. 697, 702 (S.D. Ohio 1986) ("securities laws are designed to promote a fair marketplace in order to protect the investing public" such that plaintiffs' enforcement of these federal laws provides societal benefit and supports requested fees).

---

[5] Discovery established that the kickback paid on Emery loans averaged between $200 and $300 per loan, and Emery profited from a minimum $750 administrative fee on each brokered loan.

### 3.    Whether the Services Were Undertaken on a Contingent Fee Basis

Class Counsel litigated this case on a contingent basis. Indeed, it is unlikely that the members of the Emery Class would have been able to retain counsel under another type of fee arrangement (*i.e.*, an hourly fee arrangement). *See, e.g.*, *Vigna*, No. 1:15-CV-51, 2016 WL 7034237, at *4. The contingent fee arrangement means that Class Counsel invested money, resources, and over 5,700 hours of time into this case,[6] with the very real possibility that there could be an unsuccessful outcome and no fee award, even if they won the case. *Id.*; *see also, In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 382 (S.D. Ohio 2006).

And further, Class Counsel have not been compensated for any time or expense for its work against Emery since the beginning of this litigation, when Emery was added as a Defendant in early 2015 in the Maryland case.  This "weighs in favor of granting an award of attorneys fees."  *See Feiertag v. DDP Holdings, LLC*, No. 14-CV-2643, 2016 WL 4721208, at *7 (S.D. Ohio Sept. 9, 2016) (citing *Gentrup v. Renovo Serv., LLC,* No. 1:07CV430, 2011 WL 2532922, at *4 (S.D. Ohio June 24, 2011)).

### 4.    The Value of the Services on an Hourly Basis

Under the fourth *Ramey* factor, the Court examines the value of the attorneys' services on an hourly basis by performing the "lodestar" cross-check.  *In re Cardinal Health Inc. Secs. Litigation*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007).  Under the traditional "lodestar" method, the Court first calculates the lodestar by multiplying the reasonable hours expended by class counsel by a reasonable hourly rate.  *See, e.g.*, *In re Dun & Bradstreet Credit Servs. Customer Litigation*, 130 F.R.D. 366, 373 (S.D. Ohio 1990).  Thus, the court must initially evaluate two

---

[6] *See* Ex. 1 ¶ 39, 45, 50; Ex. 2 ¶ 16, 22, 24., Ex. 3 ¶ 9, 13.

things: (i) whether the hours expended on the case are reasonable, and (ii) the applicable reasonable hourly rate. *See, e.g.*, *Michel,* No. 1:10-CV-638, 2014 WL 497031, at *12-13.

"When determining a reasonable hourly rate, 'courts use as a guideline the prevailing market rate . . . that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Id.* (citations omitted). "A district court may rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Id.* In the Southern District of Ohio, the Court also may refer to the applicable "Rubin Rate" for the attorneys that worked on the case, based on their years in practice.[7] After arriving at a reasonable hourly rate, the Court multiples it by the reasonable hours worked on the case to determine the "lodestar."

In the traditional lodestar method, after determining the lodestar, the Court may increase or decrease the lodestar by multiplying it by a factor it deems to be reasonable (the "lodestar multiplier"). *In re Cardinal Health*, 528 F. Supp. 2d at 761. "A court determines an appropriate lodestar multiplier by assessing a variety of factors, including the nature of the case, the market for such legal services, the risk involved, and the results achieved, such that the Court rewards a lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier." *Id.* (citations omitted).

The lodestar cross-check is slightly different. The Court will calculate the lodestar and lodestar multiplier and then compare the multiplier to lodestar multipliers used in similar cases. *Id.* at 767. "[I]n contrast to employing the lodestar method in full, when using a lodestar cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.* This prevents the Court from having "to endure time-consuming parsing of reams of

---

[7] The "Rubin Rate" is derived by applying a 4% annual cost-of-living allowance to the 1983 Rubin Committee rates to measure the reasonableness of fees requested. *See Vigna*, 2016 WL 7034237 at 5.

attorney time sheets and hindsight recalculations to determine the proper amount of work and charges," as it would if employing the traditional lodestar method. *Id.* at 761.

Here, as explained in more detail below, the 1.75 lodestar multiplier is well within the range of multipliers awarded in class action settlements of similar magnitude in this circuit.

### i.     Smith, Gildea & Schmidt, LLC ("SGS")

Pursuant to the Smith Declaration, from the date of opening the file through December 9, 2015, the date of the Order transferring the Emery case from the U.S. District Court for the District of Maryland to this Court[8], SGS expended numerous hours "generally applicable to all defendants", including Emery, in the Maryland Action. *See* Ex. 1, ¶ 40-41  Based on the hours expended and the hourly rate of each attorney involved for this "generally applicable" work, SGS incurred $391,147.50 in attorneys' fees, $111,681 of which represent Emery's proportionate share of the fees[9]. *Id.,* ¶ 42.  In addition, from the opening of the file through the approximate date of this filing, SGS spent numerous hours "specific to Emery."[10]  *Id.* ¶ 43. Based on the same hourly rates, SGS has incurred $953,627.50 in Emery-specific attorneys' fees. *Id.*  The table below depicts the total hours spent and hourly rates that SGS employees have worked on this matter:

---

[8] *Fangman  v.  Genuine Title,* 1:14-cv-00081-RDB, Doc. #212, Ord. on  Defs. Mot. Dismiss, Dec. 19, 2015.

[9] The proportionate share calculation has been used by Class Counsel in all settlements in the Maryland Action to apportion among lenders fees and expenses that are fairly attributable to efforts aimed generally towards all lenders in the action, e.g. oral argument on Rule 12 motions or the time and expense of obtaining Genuine Title's server through a receivership action. A lender's "proportionate share" of the "generally applicable" time and expenses is determined by looking at the total number of kickback tainted loans across all non-settled lenders and determining the percentage of that total that was brokered or originated by a particular lender. For example, if there were 100 total loans tainted by kickbacks across all lenders, and 25 loans were brokered by Emery, then Emery's "proportionate share" of the generally applicable hours and expenses would be 25%.  A lender's proportionate share changed over time as one by one lenders settled their claims.

[10] Hours "specific to Emery," include all hours from the Maryland Action directly attributable to Emery (e.g., briefing Emery's motion to transfer) and all hours once the case was transferred to this Court.

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate[11] | Total Fee |
|---|---|---|---|---|---|
| Michael Paul Smith | 1992 | 26 | 67.78 391.90 | $475 | $218,348.00 |
| Melissa English | 2004 | 14 | 723.00 | $350 | $253,050.00 |
| Michael Bowman | 2006 | 12 | 99.60 | $350 | $34,860.00 |
| Sarah Zadrozny | 2013 | 5 | 72.98 797.20 | $225 | $195,790.50 |
| Natalie Mayo | 2011 | 7 | 114.2 6.6 | $225 | $27,180.00 |
| Lauren Dodrill | 2008 | 10 | 13.96 1.8 | $350 | $5,516.00 |
| Paralegals and Law Clerks | N/A | N/A | 216.56 1987.20 | $150 | $330,564.00 |
| | | | **TOTAL:** 4492.78 | | **TOTAL**: $1,065,308.50 |

*See* Ex. 1 ¶ 39. Additionally, SGS anticipates spending an additional 50 hours following the filing of the instant Petition for drafting the Final Approval documents, preparing for and attending the Final Fairness Hearing, and for communication regarding the administration of Settlement Benefits, which are estimated to yield an additional $14,875. *Id.* ¶ 44. Accordingly, SGS attributes $1,080,183.50 in current and estimated additional attorney fees to Emery. *Id.* ¶ 45.

---

[11] Looking to the Rubin Committee rates confirms that SGS's hourly rates are reasonable. Class Counsel calculates that for each category, the Rubin Committee rates would be as follows:

| Attorney | Category | Rubin Committee Rate (Year) |
|---|---|---|
| Michael Paul Smith | Senior Partner | $432.80 (2014), $450.08 (2015), $468.08 (2016), $486.81 (2017), and $506.28 (2018) |
| Melissa English, Michael Bowman, Lauren Dodrill | Intermediate Partner | $382.51 (2014), $397.81 (2015), $413.73 (2016), $430.27 (2017), and $447.49 (2018) |
| Sarah Zadrozny, Natalie Mayo | Young Associate Intermediate Associate | $208.36 (2014), $216.69 (2015), $261.29 (2016), $271.75 (2017), and $282.62 (2018) |
| Paralegals | N/A | $127.88 (2014), $132.99 (2015), $138.31 (2016), $143.84 (2017), and $149.60 (2018) |
| Law Clerks | N/A | $80.82 (2014), $84.05 (2015), $87.42 (2016), $90.91 (2017), and $94.55 (2018) |

### ii. Joseph, Greenwald, and Laake, P.A. ("JGL")

Pursuant to the Nannis Declaration, from the date of opening the file through December 9, 2015, JGL has spent numerous hours "generally applicable to all defendants." *See* Ex. 2, ¶ 17. Based on the hours expended and the hourly rate of each attorney involved, JGL has incurred $114,506.50 in attorneys' fees for this "generally applicable" work, $41,418.65 of which represent Emery's proportionate share of the fees. *Id.,* ¶¶ 17-19. In addition, from the opening of the file through the approximate date of this filing, JGL spent numerous hours "specific to Emery." *Id.* ¶ 20. Based on the same hourly rates, JGL has incurred $206,395.10 in Emery-specific attorneys' fees. *Id.*

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate[12] | Total Fee |
|---|---|---|---|---|---|
| Timothy Maloney | 1986 | 32 | 31.65 | $475 | $15,033.75 |
|  |  |  | 79.50 | $602 | $47,859.00 |
| Veronica Nannis | 2002 | 16 | 20.56 | $350 | $7,196.00 |
|  |  |  | 166.90 | $483 | $80,612.70 |
| Joseph Creed | 2005 | 13 | .16 | $300 | $48.00 |
| Matthew Bryant | 2007 | 11 | .15 | $300 | $45.00 |
| Timothy Creed | 2009 | 9 | 43.29 | $225 | $9,740.25 |
|  |  |  | 55.10 | $410 | $22,591.00 |
| Alyse Prawde | 2014 | 4 | 4.80 | $334 | $1,603.20 |
| Megan Benevento | 2016 | 2 | 112.80 | $302 | $34,065.60 |
| Hina Hussain | 2011 | 7 | 3.33 | $255 | $849.15 |
| Paralegals and Law Clerks | N/A | N/A | 56.71 | $150 | $8,506.50 |
|  |  |  | 119.9 | $164 | $19,663.60 |
|  |  | | **TOTAL:** 694.85 | | **TOTAL:** $247,813.75 |

---

[12] When providing legal services in federal courts across the nation in complex cases like class actions and False Claims Act matters, JGL regularly bills out at consistent rates using the USAO Attorney's Fees Matrix (which is an updated *Laffey* matrix). These rates are published and used by the Civil Division of the United States Office for the District of Columbia and provide a range of rates that vary by calendar year and by years of experience from law clerk / paralegal to an attorney with more than thirty one years of experience. The rates and explanatory notes can be accessed here: https://www.justice.gov/usao-dc/file/796471/download. JGL regularly applies these rates as they have been deemed to reflect reasonable prevailing market rates in the Washington, D.C., metro area where JGL is located.

*See* Ex. 2, ¶ 16.  JGL anticipates spending an additional 15 hours following the filing of the instant Petition for drafting the Final Approval documents, preparing for and attending the Final Fairness Hearing, and for communication regarding the administration of Settlement Benefits, which are estimated to yield an additional $6,750. *Id.,* ¶ 21. Accordingly, JGL attributes $254,563.75  in current and estimated additional attorney fees to Emery. *Id.,* ¶ 22.

### iii.   Keating Muething & Klekamp PLL ("KMK")

KMK was engaged as local counsel specifically for this case, so all of KMK's time is specifically attributable to Emery.  Pursuant to the Utter Declaration, from the date of opening their file through April 30, 2018, KMK has spent 538.95 hours on the case, which amounts to $206,459.75 in attorneys' fees.  *See* Ex. 3 ¶ 9.

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate | Total Fee |
|---|---|---|---|---|---|
| Gregory Utter | 1981 | 37 | 283.75 | $500 (2015) $525 (2016) $540 (2017) | $148,593.00 |
| Kelley B. Tracey | 2010 | 8 | 2.50 | $330 | $825.00 |
| James R. Matthews | 1985 | 33 | 13.25 | $580 | $7685.00 |
| Melissa Schaub | 2015 | 3 | 200.70 | $200 (2016) $220 (2017) | $41,638.00 |
| Sophia R. Holley | 2013 | 5 | 10.00 | $225 | $2250.00 |
| Sarah A. Vonderbrink | 2015 | 3 | 1.20 | $195 | $234.00 |
| Samantha M. Casper (Law Clerk) | 2016 | 2 | 27.55 | $190 | $5234.50 |
| | | | **TOTAL:** 538.95 | | **TOTAL**: $206,459.75 |

Additionally, KMK anticipates spending an additional 8 hours following the filing of the instant Petition for drafting the Final Approval documents and preparing for and attending the Final Fairness Hearing for an additional $3,040. *Id.* ¶ 11.  Accordingly, KMK attributes a total of $209,499.75 in current and estimated additional attorney fees to Emery.[13] *Id.* ¶ 12.

---

[13] Looking to the Rubin Committee rates confirms that KMK's hourly rates are reasonable.  Class Counsel calculates that for each category, the Rubin Committee rates would be as follows:

### iv.      A 30% Fee Award Represents a 1.75 Lodestar Multiplier

Based on the Smith, Nannis, and Utter Declarations, the total lodestar amount is $1,544,247.00. Dividing the requested fee award—30% of the Common Fund, or $2,700,000— by the lodestar amount results in a lodestar cross-check multiplier of 1.75, which is within the range of multipliers this Court and others in the Sixth Circuit have found reasonable. *See, e.g.*, *Lowther*, 2012 WL 6676131 at 4 (lodestar multiplier of 3.06 was acceptable and collecting cases approving multipliers as high as 8.5); *Bower v. MetLife, Inc.*, No. 1:09-cv-351, 2012 WL 12991199 at 7 (S.D. Ohio Oct. 17, 2012)(lodestar multiplier of 1.75 on lodestar total of $1,314,488 supports reasonableness of fee request and within range of multipliers approved in Southern and Northern Districts of Ohio and affirmed by the Sixth Circuit)(collecting cases); *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486 at 15 (2.42 multiplier on lodestar total of $1,413,433 and 2600 hours of invested time "underscores the reasonableness of the requested fee"); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991) (2.4-2.6 multiplier on $5 million requested fees is "reasonable and conservative"); *City of Plantation Police Officers' Employees' Retirement System v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *19 (S.D. Ohio Dec. 30, 2014) (finding that the case justified a multiplier of at least 3); *Michel*, No. 1:10-CV-638, 2014 WL 497031, at *23 (S.D. Ohio Feb. 7, 2014) (approving a lodestar multiplier of 1.8); *Connectivity Sys. Inc. v. Natl. City*

| Attorney | Category | Rubin Committee Rate (Year) |
|---|---|---|
| Gregory Utter | Senior Partner | $450.08 (2015), $468.08 (2016), $486.81 (2017), and $506.28 (2018) |
| Melissa Schaub | Young Associate Intermediate Associate | $225.36 (2016), $271.75 (2017), and $282.62 (2018) |

While Gregory Utter's rate is higher than the Rubin Committee rates, Mr. Utter has been practicing law for thirty-seven years and has received numerous accolades for his work as a preeminent trial attorney, as detailed more in the Utter Declaration. The rates of Melissa Schaub are lower than the Rubin Committee rates for all the years that she worked on the case. A handful of other KMK attorneys worked on the case for a limited number of hours to provide guidance relating to regulatory matters and insurance coverage issues. Some of their rates are higher than the Rubin rates to reflect their niche expertise in these areas.

*Bank*, No. 2:08-CV-1119, 2011 WL 292008, at *13 (S.D. Ohio Jan. 26, 2011) (finding that a lodestar multiplier of 2.39 supported reasonableness of requested fees); *see also, Underwood v. Carpenters Pension Trust Fund-Detroit and Vicinity*, No. 13-CV-14464, 2017 WL 655622, at *14 (E.D. Mich. Feb. 17, 2017). ("'Most courts agree that the typical lodestar multiplier' in a large class action 'ranges from 1.3 to 4.5'") (citing *Cardinal Health*, 528 F. Supp. 2d. at 767).

### v.  The Expenses Incurred by Class Counsel are Reasonable.

In addition to attorneys' fees, Class Counsel request reimbursement of expenses in the amount of $81,450.31. The payment of Class Counsel's expenses is provided for in the Settlement Agreement. Doc. # 341-2, Settle. Agreement, PageID12075-076, § 13.

Here, the expenses incurred by Class Counsel are reasonable and were necessary to reach settlement with Emery.  Pursuant to the Smith Declaration, from the date of opening the file through the date of the order transferring this action to this Court,  SGS incurred $25,032.49 in expenses "generally applicable to all defendants" in the Maryland Action, of which Emery's proportionate share is $6,615.62.[14] Ex. 1, ¶ 47.  From the opening of the file through the approximate date of this filing, SGS incurred $42,202.16 in expenses specific to Emery.  *Id.,* ¶ 48.  In addition, SGS anticipates that it will incur $710 in expenses associated with the Final Fairness Hearing, the administration of the Settlement, and the winding up of this matter.  *Id.,* ¶ 49.  Accordingly, SGS attributes a total of $49,527.78 in current and estimated expenses to be reimbursed from the Common Fund reached in this Settlement. *Id.,* ¶ 50.

The Nannis Declaration establishes that from the date of opening the file through the date of order transferring the case to this Court, JGL incurred $48,299.79 in expenses "generally applicable to all defendants" in the Maryland Action, of which Emery's proportionate share is

---

[14] Emery's proportionate share of  expenses  is calculated in the same way as its proportionate share of fees, see n. 9, *supra.*

$14,673.62. Ex. 2 ¶ 24. From the opening of the file through the approximate date of this filing, JGL incurred $10,783.97 in expenses specific to Emery. *Id.,* ¶ 25. JGL anticipates incurring $582 in expenses associated with the Final Fairness Hearing. *Id.,* ¶ 26. Accordingly, JGL attributes a total of $26,039.59 in expenses to be reimbursed from the Common Fund. *Id.*, ¶ 27.

The Utter Declaration establishes that from the date of opening the file through April 30, 2018, KMK incurred $5,882.94 in expenses, to be reimbursed from the Common Fund reached in this Settlement. *See* Ex. 3, ¶ 14.

Based on the Smith, Nannis, and Utter Declarations and the materials attached thereto, the fourth *Ramey* factor—examining the value of the services on an hourly basis and performing the lodestar cross-check—weighs in favor of granting Class Counsel's petition for attorneys' fees and expenses, particularly in light of the extensive work performed by Class Counsel and the effective result obtained on behalf of the Emery Class.

### 5. The Complexity of the Litigation

Emery received kickbacks on the second largest number of loans of all lenders involved in the Genuine Title Kickback Scheme, both in this litigation and in Maryland. Only Wells Fargo subjected more loans to kickbacks than Emery, but the claims against Wells Fargo were never fully litigated because Wells Fargo settled shortly ***before*** Rule 12 motion practice in the Maryland Action. The only lender that engaged in any significant discovery in the Maryland action was West Town Savings & Trust, with slightly more than 200 loans subject to kickbacks and only handful of branches all located in Maryland. While this case was related to the Maryland Action, the claims against Emery were more complicated, and litigated much more extensively, than the claims against any other lender.

The docket in this case testifies to the complexity of this litigation. Emery brought two full rounds of Rule 12 motion practice, complete with intervening United States Supreme Court

case law and supplemental briefing on collateral legal issues posed by the Maryland litigation. Plaintiffs' access to even basic discovery was complicated by Emery's claimed failure to retain evidence in the wake of the closure of its mortgage division in 2014 and precipitated a full course of discovery motion practice with Magistrate Karen Litkovitz. This motion practice was conducted over more than six weeks, necessitated Plaintiffs' retention of an ESI consulting expert for repeated consultation with Emery's IT manager, and resulted in a reported opinion related to Emery's repeated attempts to require Plaintiffs' to file a "trial plan" with its class certification motion.

Plaintiffs' class certification motion was supported by 12 depositions and 35 exhibits numbering more than 800 pages. Settlement was preceded by Emery's petition for interlocutory appeal of the Court's class certification order to the Sixth Circuit based in large part on the "novel and unsettled legal issues" raised by the litigation. *Emery Fed. Credit Union v. Palombaro*, No. 17-309, Doc. #1, Pet. for Leave to File App. of Class Certification Order at 5-9 (6th Cir. August 24, 2017).

Class Counsel have fully met each challenge presented by Emery's formidable defense and counsel as well as the facts and circumstances of the litigation, but three challenges in particular support the reasonableness of the requested fees.

### i. The Complexity of Gathering Evidence Against Emery's Vast Mortgage Division.

While Emery likes to claim it is a small credit union, during the time period of the Kickback Scheme, Emery had 27 loan production offices in 12 states with more than 400 loan officers scattered across the country. Gathering evidence to support the individual and class claims against Emery's vast mortgage operations was arduous and complicated.

Class Counsel issued 39 third-party subpoenas to financial institutions to obtain, process and analyze over 45,000 pages of bank statements, checks, and deposits records, to identify hundreds of transactions representing kickback payments received and accepted by Emery employees. As the great majority of the cash kickback payments were received and accepted by Emery employees through sham LLCs, identifying and tracing kickback payments also required significant investigation and review of public information and records in more than 20 states to identify the sham LLCs and connect these entities with Emery employees. Class Counsel then negotiated and obtained affidavits from several Emery brokers authenticating the financial records memorializing the kickbacks paid to sham LLCs and establishing the scope of Emery's employees' participation in the Kickback Scheme. These extraordinary efforts identified more than $1 million in specific cash kickback payments to Emery brokers and branch managers.

While Emery was still a defendant in the Maryland action, Class Counsel petitioned and secured the appointment of a Receiver for Genuine Title who in turn secured one of Genuine Title's servers and related electronic records. *See* Ex. 1, ¶ 17. Class Counsel extracted from Genuine Title's server a spreadsheet ("TSS Spreadsheet") from Title Express, a software program Genuine Title used to save and maintain the electronic loan information for loans it closed or for which it otherwise provided a settlement service. *Id.*, ¶¶ 18-20.  Class Counsel correlated the specific payments made to Emery brokers from among the 45,000 pages of bank statements with specific loans in the TSS spreadsheet, providing transaction level evidentiary support for Emery's participation in the Kickback Scheme and confirming the per unit kickback and other terms of the kickback agreements between specific Emery branches and Genuine Title.

In addition, as a result of the discovery motion practice with Magistrate Litkovitz, Emery produced "LOS" data on 5,022 loans its records indicated an Emery broker referred to Genuine

18

Title in the relevant time period.  Class Counsel undertook an extensive matching process cross-referencing Emery's LOS data with the 4,944 loans identified in the TSS Spreadsheet and identifying 4,446 "Matched Class Loans," the minimum outline of the Emery Class. This matching process involved reviewing and analyzing thousands of additional electronic records and consulting public land records across the country to confirm conflicting or missing information. The Matched Class Loans were cross-referenced with discovery on Emery's loan production offices and loan officers to identify the 13 Emery branches and more than 200 loan officers who participated in and benefited from the Kickback Scheme. Class Counsel used this data to obtain deposition testimony from Genuine Title principals establishing the specific participation of each of the 13 Emery Class branches.

Plaintiffs issued 27 interrogatories and 38 requests for production of records from Emery covering its mortgage division operations, policies and procedures, and communications with and among its employees related to the Kickback Scheme. Class Counsel obtained and reviewed hundreds of gigabytes of electronic records from more than 100 Emery custodians, and issued two sets of requests for admissions concerning more than 500 putative Emery employees. From this data, Class Counsel was able to identify the type of kickbacks – cash, marketing materials, and/or marketing credit - being received by a specific Emery branch or broker.  This data also allowed Class Counsel to identify the third party marketing services providers who were facilitating the marketing credit kickbacks as the middlemen between Emery brokers and Genuine Title and to issue subpoenas to these businesses to obtain invoices and other records which were, in some instances, the only documentary evidence of this class of kickbacks.

In effect, the size of Emery's mortgage division and the breadth of its employees' participation in the Kickback Scheme required Class Counsel to conduct a large-scale

government-style investigation in the limited time period for pre-certification discovery. Class Counsel's extraordinary effort put the parties and the Court in the position to know, as Class Counsel stated in its motion for class certification, exactly "who gave and got what, when, how much and why."  Doc. #325, Pls. 2d Am. Mot. for Class Certification, PageID 9547.

> **ii.     The Size of the Emery Class Raised Novel Legal Issues for Class Certification.**

While class certification adds a layer of complexity to any commercial litigation, class certification in this case was particularly complicated because of a series of decisions from the Northern District of Ohio denying class certification to similar borrower classes in RESPA cases.[15]  These decisions turned on mechanical concerns, specifically the ability to easily identify loans as "federally related" for the purposes of RESPA and the application of RESPA's statutory exceptions.  Class Counsel assumed (correctly) that Emery would lean heavily on these cases because the Emery Class is so large - Emery is the defendant lender with the second largest number of borrowers victimized by kickbacks, with Emery's participation in the Genuine Title Kickback Scheme far exceeding that of much larger mortgage lenders such as JPMorgan Chase, PNC, and MetLife. Class Counsel had to break new evidentiary and legal ground to carry its burden for class certification.

Class Counsel started with an analysis of the Matching Class Loans, and identified data points in the TSS Spreadsheet and Emery's LOS data (and, in hundreds of cases, from review of public land records) that identified the type of loan (conventional mortgage, refinance, etc.) and the government program (VA, FHA, FBA) under which a loan was guaranteed or insured. Class

---

[15], *See, e.g.*, *Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 284 (N.D. Ohio 2006);*Powers v. Fifth Third Mortg. Co.*, No. 1:09-cv-2059, 2011 WL 3811129, at *19 (N.D. Ohio Aug. 12, 2011); *Toldy v. Fifth Third Mortg. Co.*, No. 1:09-CV-377, 2011 WL 4634154, at *3-4 (N.D. Ohio Sep. 30, 2011). Before this Court's Order granting Plaintiffs' Second Amended Motion for Class Certification, no court in the Sixth Circuit had certified a class action involving RESPA claims

Counsel then undertook analysis and became experts in the complex qualification and regulatory requirements of these government insurance programs. As a result, Class Counsel was able to demonstrate that the vast majority of the Emery Class Loans were VA IRRRL "NoCashOut" refinances and to identify specific regulatory requirements of the VA IRRRL loan program which dictated that each VA IRRRL qualified as "federally related" for the purposes of RESPA and, as a general rule, that excluded Emery's argument that RESPA's statutory exception might apply.

This analysis, and the evidence supporting it, broke new ground in the Sixth Circuit and allowed Class Counsel to provide the Court with an evidentiary and legal basis for class certification that was found to not be present in earlier cases. It also allowed Plaintiffs' to carry their burden of demonstrating commonality, predominance and manageability despite the large size of the Emery Class.  Clearing this hurdle was essential to recovery for the Emery Class.

### iii. Settlement Raised Insurance Issues of First Impression.

As discussed above and at the Preliminary Approval Hearing, Emery's regulatory environment and capital requirements raised difficult and sophisticated valuation issues that required Class Counsel to retain a financial institutions expert to negotiate the best settlement possible with the least regulatory risk for the Emery Class. Settlement also required Class Counsel to address legal issues related to Emery's insurance and financial institutions bond coverage, and its insurer's corresponding coverage positions and reservations of rights.  These required Class Counsel to become experts on financial institutions bonds, evaluate the coverage opinions offered by Emery's insurer and bond holder in its reservation of rights, and develop a factual and contract basis for competing coverage positions.

Emery's financial institutions bond coverage, in particular, raised novel legal issues. The NCUA requires federal credit unions to maintain a financial institutions bond to cover acts of fraud committed by their employees. 12 C.F.R. §§713.3-713.6.  During the relevant time period, Emery carried the statutorily required financial institutions bond under a NCUA approved form, but attached to that form an optional "Consumer Legislation" coverage which Emery, and its insurer, claimed reduced bond coverage below statutory requirements for fraudulent acts related to certain enumerated federal consumer laws, including RESPA. Class Counsel determined that no court had been called on to interpret the multiple contract provisions relied on by Emery and was compelled to consult outside counsel to evaluate the likelihood that Class Counsel's competing interpretation would prevail if the matter were litigated.

Emery's insurance coverage played a pivotal role at the settlement conference and Class Counsel's ability to respond to Emery's coverage positions in the settlement conference was critical in maximizing the recovery for the Emery Class. Class Counsel's proficiency over these complex issues and unchartered waters strongly supports the requested fees.

In sum, because this was a complex piece of litigation, separate and apart from the companion litigation in Maryland, the fifth *Ramey* factor supports the requested fee award.

### 6. The Professional Skill and Standing of Counsel on Both Sides

The sixth *Ramey* factor considers the professional skill and standing of all counsel.

#### i. Class Counsel

As the Smith, Nannis, and Utter Declarations attest, Class Counsel and their firms are experienced, highly regarded and reputable trial attorneys, particularly in the areas of complex commercial and class action litigation.  *See* Ex. 1, ¶¶ 3-12, Ex. 2, ¶¶ 3-14, and Ex. 3, ¶¶ 3-7.

#### ii. Counsel for Emery

In assessing the skill of counsel, it is also important to assess the quality of defense counsel as well, to determine the quality of service counsel rendered. *See Lowther,* No. 1:11-CV-877, 2012 WL 6676131, at *3 (citing *Smilie v. Park Chem. Co.,* 710 F. 2d 271, 275 (6th Cir. 1983)). Emery was represented by reputable and highly regarded attorneys in this case. Lead Counsel, Michael Kieval of Weiner Brodsky Keider PC, has been practicing law for over ten years. Mr. Kieval's practice focuses on class action defense and regulatory compliance, with specific experience representing lenders and servicers in putative RESPA class actions.

Carolyn Taggart of Porter Wright Morris and Arthur LLP is a highly regarded attorney in the area who has been practicing law for forty years and has extensive jury and bench trial and appellate experience in both state and federal courts. Like Messrs. Utter and Maloney, Ms. Taggart has been recognized as a Fellow in the American College of Trial Lawyers. She has substantial experience in complex commercial and class action litigation.

Because both Class Counsel and counsel for Emery are a group of skilled, highly regarded attorneys, the sixth *Ramey* factor weighs in favor of approval of the fee award.

### B. Class Representatives' Request for Service Awards is Reasonable

In its Preliminary Approval Order, the Court designated as Class Representatives Frank and Shelly Palombaro, Kevin and Jennifer McAlpin, Gary Ratcliff, and David and Melinda Alvarado. Doc. #344, Order Granting Plfs. Mot. For Prelim. App. Of Class Action Settle., PageID12096, ¶5. They each request a service award of $5,000, for 7 awards totaling $35,000. Under the Settlement Agreement, Service Awards will be paid out of the Common Fund and in addition to the Class Representatives' other Settlement Benefits. Doc. #341-2, Settle. Agreement, PageID12075, § 12.

Incentive payments or service awards are common in class actions. *Estep v. Blackwell*, No. 1:06cv106, 2006 WL 3469569 at 6 (S.D. Ohio Nov. 29, 2006) ("an incentive award is an

effective tool to encourage a class member to become the class representative and to reward their individual efforts taken on behalf of the class") (citing *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir. 2003)).  Service awards are appropriate when the class representative's efforts result in the establishment of a common fund benefitting the class.  *Id.* at *19-20.  Court also may consider class representatives' "actions to protect the rights of the class members and whether those actions resulted in a substantial benefit to the class members, whether the class representative assumed any direct or indirect financial risk, and the amount of time and effort spent pursuing the litigation."  *Johnson v. Midwest Logistics Sys. Ltd.*, No. 2:11-CV-1061, 2013 WL 2295880, at *5 (S.D. Ohio May 24, 2013) (citations omitted).

The requested Service Awards are within the range of reasonable awards. *See, e.g.*, *Michel*, No. 1:10-CV-638, 2014 WL 497031, at *12 ("There is precedent for incentive awards in the neighborhood of $1,000 to $5,000 in consumer protection class actions"); *see also; In re: Whirlpool Corp. Front–Loading Washer Prod. Liab. Litig.*, No. 1:08-WP-65000, 2016 WL 5338012, at *25 (N.D. Ohio Sept. 23, 2016) (finding that requested incentive awards of $4,000 were "on the low end" and "fairly proportionate to the named Plaintiffs' levels of participation").

Service awards are appropriate in this case because each Class Representative individually participated in substantial pre-certification discovery that directly led to the Settlement, Common Fund and Settlement Benefits. Specifically, each Class Representative answered two sets totaling 16 multi-part interrogatories including applicable supplements, responded to two sets of requests for production of documents containing 20 separate document requests, sat for depositions and consulted with Counsel during settlement negotiations. Notably, the Class Representatives testified and produced documents related to all mortgage transactions in the last decade, and traveled significant distances to appear for deposition. Mr. Palombaro and

24

Mr. Ratcliff both travelled to attend the hearing on Plaintiffs' Motion for Class Certification. All of the Class Representatives were fully engaged in the litigation and instrumental to recovery for the Emery Class. *See Bower,* No. 1:09-cv-351, 2012 WL 12991199 at 8 (approving $5,000 Service Award to class representatives who completed written discovery, were deposed, maintained contact with counsel, and approved settlement).

The Notice given to all potential class members included notice that the Class Representatives intended to request $5,000 each as a Service Award. No objections were filed to the Settlement or the Service Awards, a presumptive acknowledgment that the awards are fair and reasonable. Given this presumption and the Class Representatives extensive participation, the Court should deem these awards fair and reasonable and should approve them as requested.

## II.     CONCLUSION

For the reasons set forth above, Class Counsel respectfully request the Court grant their unopposed petition for fees in an amount of 30% of the Common Fund, plus expenses, as fair and reasonable. Moreover, Class Representatives Frank and Shelly Palombaro, Kevin and Jennifer McAlpin, Gary Ratcliff, and David and Melinda Alvarado respectfully request that this Court approve Service Awards of $5,000 each to be paid from the Common Fund.

Respectfully submitted,

/s/ Gregory M. Utter
Gregory M. Utter (0032528)
Melissa A. Schaub (0093352)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH  45202
Phone:  (513) 579-6540
Fax:  (513) 579-6457
gmutter@kmklaw.com
mschaub@kmklaw.com

/s/ Michael Paul Smith
Michael Paul Smith (*admited pro hac vice*)
Melissa L. English (*admitted pro hac vice*)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD  21204
Phone:  (410) 821-0070
Fax:  (410) 821-0071
mpsmith@sgs-law.com
menglish@sgs-law.com

/s/ Timothy F. Maloney
Timothy F. Maloney (*admitted pro hac vice*)
Veronica B. Nannis (*admitted pro hac vice*)
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
Phone:  (301) 220-2200
Fax:      (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify this 11th day of May, 2018, that copies of the foregoing were served via the CM/ECF system to all counsel of record.

/s/ Gregory M. Utter
Gregory M. Utter

26