IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Frank A. and Shelly Palombaro, Jr., | : | Case No. 1:15-cv-792 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | Amended Order Approving Settlement |
| | : | Agreement and Granting Attorneys' |
| Emery Federal Credit Union, | : | Fees, Expenses, and Service Awards |
| | : | |
| Defendant. | : | |

This matter is before the Court on Class Counsel's and Class Representatives'
Unopposed Petition for Attorneys' Fees and Expenses and for Class Representatives' Service
Awards for Emery Federal Credit Union Settlement (Doc. 350) and Plaintiffs' Motion for Final
Approval of Emery Federal Credit Union Class Action Settlement (Doc. 355). For the reasons
that follow, the Court will **GRANT** both Motions.

I.      **Background**

This case involves an alleged mortgage kickback scheme in which Genuine Title, LLC
("Genuine Title") by itself and through sham companies, provided cash payments, marketing
materials, and other benefits to mortgage brokers employed by Emery Federal Credit Union
("Emery"). In return, the Emery mortgage brokers referred clients to Genuine Title for title and
settlement services. This scheme is alleged to violate the Real Estate Settlement Procedures Act
("RESPA"), 12 U.S.C. § 2601.

The Court previously detailed the extensive procedural history of this case in its July 1,
2016 Order Denying Defendant's Motion to Dismiss and Granting Defendant's Motion to Strike.
(Doc. 242.) Briefly stated, this action was severed and transferred from a larger action in the
United States District Court for the District of Maryland to the United States District Court for

the Southern District of Ohio.  On August 10, 2017, the Court granted Plaintiffs' second amended motion for class certification.  (Doc. 338.)  On November 14, 2017, the parties filed a Motion for Preliminary Approval of the Settlement of All Claims Asserted Against Emery Federal Credit Union (Doc. 341), and the Court granted Preliminary Approval of the parties' Class Action Settlement Agreement ("Settlement Agreement") (Doc. 341-2) on January 25, 2018.  (Doc. 344.)  The Settlement Agreement provides for a $9,000,000 common fund, from which settlement benefits and other distributions are to be made.

On May 11, 2018, Plaintiffs filed their Unopposed Petition for Attorneys' Fees and Expenses and for Class Representatives' Service Awards, seeking attorneys' fees in the amount of 30% of the common fund, or $2,700,000, reimbursement of expenses incurred in the amount of $81,450.31, and service awards of $5,000 to each class representative, for a total of $35,000 in service awards.  (Doc. 350/353.)   Responding, Defendant objects not to the awards requested but to "gratuitous and incorrect assertions in the Petition, as well as to Plaintiffs' decision to reveal part of the confidential settlement negotiations in a footnote."  (Doc. 354 at PageID 13042.)

On June 8, 2018, Plaintiffs filed a Motion for Final Approval of the Settlement Agreement.  (Doc. 355.)   The Court held a final fairness hearing on July 10, 2018.  No objectors attended the hearing, and no objections to the Settlement Agreement were filed.  The matter is now ripe for decision.

## II.     Final Approval of the Settlement Agreement

### A.  Settlement Agreement Terms

The Court will first consider final approval of the Settlement Agreement, which includes the following key provisions.  First, the Settlement Agreement modifies the definition of the

"Emery Class." During settlement negotiations, the parties became aware of a technical aspect of the class definition that required clerical modification to avoid potential ambiguities. The modified class definition is as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Emery for which Genuine Title provided a settlement service, as identified on the borrower's HUD-1, between January 1, 2009, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009, through December 31, 2014, was an employee, officer and/or agent of Defendant Emery Federal Credit Union, Genuine Title LLC, Brandon Glickstein, Inc., Competitive Advantage Media Group LLC, and/or Dog Days Marketing, LLC.

(hereinafter the "Emery Class")[1] (Doc. 341-2 at PageID 12059.)

The Settlement Agreement establishes a $9,000,000 common fund of which the Emery Class will receive a proportionate share after the deduction for payment of a settlement administrator, payment of class counsel's costs, expenses, and fees, and payment of class representatives' service awards. Class counsel may petition the court for approval of attorneys' fees and expenses not to exceed 30% of the common fund and for expenses actually incurred, and class representatives may petition the Court for service awards not to exceed $5,000 per award. Plaintiffs estimate that taking all the deductions into consideration, class members are projected to recover approximately $1,160 per loan.

---

[1] The class previously was defined as follows, with the now-omitted language in bold:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Emery for which Genuine Title provided a settlement service, as identified **in Section 1100** on the borrower's HUD-1, between January 1, 2009, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009, through December 31, 2014, was an employee, officer, **member** and/or agent of Defendant Emery Federal Credit Union, Genuine Title LLC, Brandon Glickstein, Inc., Competitive Advantage Media Group LLC, and/or Dog Days Marketing, LLC.

(*See* Doc. 338 at PageID 11989.) The Court finds that the changes to the class definition are clerical and do not alter the Emery Class or its members pursuant to Rule 23. Accordingly, these changes are approved pursuant to Fed. R. Civ. P. 23(c)(1)(C).

A *cy pres* is established for any amounts remaining in the common fund after a certain amount of time has elapsed and attempts have been made to reissue unclaimed checks.  In addition, the Settlement Agreement describes a plan to notify class members of the Settlement Agreement, provides for time to object and opt-out of the Settlement, and sets forth a release, waiver, and covenant not to sue.

### B.  Final Approval Under Federal Rule of Civil Procedure 23(e)

Pursuant to Rule 23(e), the claims, issues, or defenses of a certified class may be settled only with the Court's approval, through which the following procedures apply:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).   In determining whether the terms of the settlement are "fair, reasonable, and adequate" under Rule 23, the Court considers several factors, including: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.  *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

The Court finds that all of these criteria are met here, for the reasons set forth by class counsel in their brief and as stated on the record at the final approval hearing.  First, the risk of

fraud or collusion is low, as the parties' negotiations were at arms-length and preceded by adversarial litigation, including disputed briefing over dismissal and class certification. Plaintiffs spent months investigating Genuine Title's practices and developing their claims through extensive discovery practice. Settlement was reached after a full-day conference with Magistrate Judge Stephanie K. Bowman, which reflect the arms-length nature of such negotiations. Finally, the structure of the settlement is for a substantial, maximized benefit, as settlement benefits are directly payable to class members without the time and expense of a claims process, and a *cy pres* is established for residual amounts. Class counsel estimate that the amount each class member receives will be approximately 65% of the title and settlement charges related to Emery loans.[2]

Second, the complexity, expense and likely duration of the underlying litigation supports approval as well. Taking this case to trial presented serious risks to both class members and Emery. Discovery and motion practice have been contentious, and Emery raised limitations and other affirmative defenses. In addition, both parties faced the complexity and logistical difficulty of trying a 5,000-member class action to a jury. Emery's petition to the Sixth Circuit also was pending at the time the parties reached settlement. Plaintiffs' expert advised that if Plaintiffs succeeded on appeal and recovered a judgment greater than the settlement amount, such a judgment would have likely resulted in Emery's involuntary liquidation by its regulator, the National Credit Union Administration ("NCUA"), and rendered the judgment uncollectible.

---

[2]Class counsel originally estimated at the preliminary approval stage that class members would receive nearly 100% of title and settlement charges related to their Emery loans. Since preliminary approval, class counsel identified approximately 890 more class loans, raising the total number from 4,400 to 5,290. In addition, the estimated average settlement charge of $1,500 is now known to be approximately $1,835. Despite these changes, the Court is still satisfied that the average recovery is very good, as class members' settlement costs ranged from below $800 to $4,000. (*See* Doc. 355-1 at PageID 13055 n.4.)

Thus, this Settlement Agreement secures a tangible recovery while avoiding the significant regulatory risk Plaintiffs faced if they succeeded at trial. In addition, the settlement avoids the additional fees, costs, and delay of an appeal to the Sixth Circuit, which likely would have added years to recovery.

Third, the discovery engaged in by the parties to date has been extensive and weighs in favor of final approval. Discovery involved tremendous efforts to uncover the size and scope of the alleged scheme, which was detailed at length at the final fairness hearing. Class counsel represent that they served 39 third-party records subpoenas, reviewed tens of thousands of bank records and loan documents, conducted thirteen depositions, and conducted land records research across more than twenty-five states. This discovery was instrumental in allowing Plaintiffs to evaluate the strengths and weaknesses of the claims and defenses to make an informed decision regarding settlement.

Fourth, the settlement provides relief to class members and eliminates the risks of trial. Although success at trial could have yielded treble damages, class members faced a risk of not being able to recover any potential judgment, as previously noted. Fifth, class counsel and class representatives find the settlement to be fair and favorable, which weighs in favor of approval. Sixth, there have been no objections to the settlement, and one exclusion request has been submitted by Dean and Dolores Bakken. The class members on 5,289 out of 5,290 class loans have sought to participate in the settlement, which the Court interprets as demonstrating satisfaction among class members. Thus, factors four, five, and six weigh in favor of approval.

Finally, seventh, the settlement serves the public interest by ensuring a real recovery to the maximum number of affected consumers, conserving resources of the parties and the Court,

eliminating the risk of non-recovery, and protecting consumers from the harm of unnecessarily high settlement charges and abusive practices. This factor, too, weighs in favor of approval.

In all, the Court is satisfied that the settlement is certainly "fair, reasonable, and adequate" under Rule 23.

### C. Notice and Objections

The Court concludes that the settlement administrator has timely completed the notice plan described in the Settlement Agreement by the timely mailing of the Court-approved mailed notice to the members of the Emery Class and by establishing the settlement website. Further, Emery has complied with 28 U.S.C. § 1715 and Section 17.2 of the Settlement Agreement by sending a Notice of Proposed Class Action Settlement to all required agencies under the Class Action Fairness Act, and none of the notice recipients have filed objections to the settlement.

## III. Attorneys' Fees, Expenses, and Service Awards

Having found the settlement to be fair, reasonable, and adequate, the Court will next consider the matter of attorneys' fees, expenses, and service awards. Class counsel move the Court to approve an award of attorneys' fees in the amount of 30% of the $9,000,000 common fund, for a $2,700,000 fee award, and for reimbursement of $81,450.31 in expenses. Class representatives seek Court approval of service awards for each of seven named class representatives, for a total of $35,000. As the parties agreed to a clear-sailing clause, the request

is unopposed.[3]  The Court will first consider the request for attorneys' fees and expenses and then turn to the request for service awards.

## A. Request for Attorneys' Fees and Expenses

Class members are represented by counsel from three law firms: Smith, Gildea & Schmidt, LLC ("SGS"), Joseph, Greenwald, and Laake, P.A. ("JGL"), and Keating, Muething, & Klekamp, PLL ("KMK").  A member from each firm has submitted a declaration attesting to the experience of its attorneys and billing records in this case.  (*See* Doc. 350-1–350-3 (redacted)).[4] Counsel argue that each firm's lodestar–the number of hours expended multiplied by a reasonable hourly rate–is reasonable.  Class counsel totals the lodestar of all firms at $1,519,582 and $24,665 in anticipated future bills.  They argue that these fees, multiplied by a cross-check multiplier of 1.75, support the requested award of $2,700,000, or 30% of the common fund.  The Court will consider each firm's lodestar and then consider the application of a cross-check multiplier.

### 1. SGS

SGS, the lead firm in this case, has billed a total of 4,492.78 hours for a total lodestar of $1,065,308.50.  (Doc. 353-1 at PageID 12655.)  SGS anticipates an additional 50 hours of time following the filing of both the attorneys' fees and final approval motions for preparing for and attending the final fairness hearing and communicating regarding administration of settlement

---

[3] As noted previously, Emery did file a response to object to "certain gratuitous and incorrect assertions" and "Plaintiffs' decision to reveal part of the confidential settlement negotiations in a footnote," but the substance of the request is not opposed.  (Doc. 354 at PageID 13042.)

[4] Because some billing records contain attorney-client privileged information, they were also filed in unredacted form at Doc. 353-1–353-3 for the Court's review.

benefits at an estimated expense of $14,875.[5] (*Id.*) SGS has incurred $$49,527.78 in expenses, which includes $710 in anticipated travel expenses for the final fairness hearing. (*Id.* at PageID 12655–56.)

Information about SGS's billings, hourly rates, and qualification of its employees is attested to by Michael Paul Smith, a member of SGS and lead counsel in this case. (Doc. 350-1.) He attests that he received his J.D. from the University of Baltimore and was admitted to practice in Maryland in 1992. (Doc. 350-1 at PageID 12175.) He has represented plaintiffs for 26 years and has tried over 50 cases in state and federal court. (*Id.* at PageID 12176.) Melissa English is a senior associate at SGS who received her J.D. from the University of Arizona Rogers College of Law and is admitted to the Maryland bar. (*Id.*) She is experienced in complex commercial litigation and represents borrowers and lenders in mortgage-related actions. (*Id.*) Sarah Zadrozny is an associate at SGS who received her J.D. from the University of Baltimore and was admitted to practice in Maryland in 2013. (*Id.*) SGS first learned of the Genuine Title kickback scheme by investigating rumors from industry sources, which led to filing suit in December 2013 after investigation. (*Id.* at 12177.)

Mr. Smith has reviewed his firm's billed time and expenses on this matter, which total 4,492.78 hours. (*Id.* at 12179–80.) A portion of the billed time and expenses were attributable to all clients prior to the severance of this action from the United States District Court of Maryland. SGS determined that Emery's proportionate share of those generally-applicable hours was determined by looking at the total number of kickback-tainted loans across all non-settled lenders and determining the percentage of that total that was brokered or originated by Emery.

---

[5] However, SGS does not break down its estimated total by attorney, task, hourly rate, and anticipated time spent on the task.

(*Id*. at PageID 12180.)  After the case was severed from the original action in Maryland and transferred to this Court, only Emery-specific time is included in the fee calculation.  (*Id*.)  In addition, Smith has calculated a proportionate share of expenses prior to the action being transferred to this Court.  (*Id*. at 12181.)

Mr. Smith attests that the following chart reflects the experience levels, hours spent, and hourly rates applicable to the SGS employees who have worked on this case:

| Attorney | Year Admitted | Years in Practice | Hours[6] | Hourly Rate[7] | Total Fee |
|---|---|---|---|---|---|
| Michael Paul Smith | 1992 | 26 | 67.78 391.90 | $475 | $218,348.00 |
| Melissa English | 2004 | 14 | 723.00 | $350 | $253,050.00 |

---

[6] As explained at the final fairness hearing, many billing employees have two separate sets of hours: the first is the Emery-specific time using a proportional share calculation prior to this case being transferred and severed to this Court, and the second is the Emery-only time since the transfer.  The total number of hours for the firm includes both sets of hours.

[7] The parties also submitted the Rubin Committee rates for its attorneys.  Judges in the Southern District of Ohio often refer to the 1983 Rubin Committee rates and apply a 4% annual cost-of-living allowance to measure the reasonableness of fees requested.  *Hunter v. Hamilton Cty. Bd. Of Elections*, No. 1:10-cv-820, 2013 WL 5467751, at *17 (S.D. Ohio Sept. 30, 2013).  That committee arrived at the following categories and hourly rates for 1983: Paralegals—$37.91/hour; Law Clerks—$23.96/hour; Young Associates (2 years of experience or less)—$61.77/hour; Intermediate Associates (2 to 4 years of experience)—$71.62/hour; Senior Associates (4 to 5 years of experience)—$82.81/hour; Young Partners (6 to 10 years of experience)—$96.39/hour; Intermediate Partners (11 to 20 years of experience)—$113.43/hour; and Senior Partners (21 or more years of experience)—$128.34/hour.  *Id.* at n.9.  Counsel have calculated the following Rubin Committee rates for its billing attorneys and other employees:

| Attorney | Category | Rubin Committee Rate (Year) |
|---|---|---|
| Michael Paul Smith | Senior Partner | $432.80 (2014), $450.08 (2015), $468.08 (2016), $486.81 (2017), and $506.28 (2018) |
| Melissa English, Michael Bowman, Lauren Dodrill | Intermediate Partner | $382.51 (2014), $397.81 (2015), $413.73 (2016), $430.27 (2017), and $447.49 (2018) |
| Sarah Zadrozny, Natalie Mayo | Young Associate Intermediate Associate | $208.36 (2014), $216.69 (2015), $261.29 (2016), $271.75 (2017), and $282.62 (2018) |
| Paralegals | N/A | $127.88 (2014), $132.99 (2015), $138.31 (2016), $143.84 (2017), and $149.60 (2018) |
| Law Clerks | N/A | $80.82 (2014), $84.05 (2015), $87.42 (2016), $90.91 (2017), and $94.55 (2018) |

(Doc. 350 at PageID 12159, n.11.)

| Michael Bowman | 2006 | 12 | 99.60 | $350 | $34,860.00 |
|---|---|---|---|---|---|
| Sarah Zadrozny | 2013 | 5 | 72.98 797.20 | $225 | $195,790.50 |
| Natalie Mayo | 2011 | 7 | 114.2 6.6 | $225 | $27,180.00 |
| Lauren Dodrill | 2008 | 10 | 13.96 1.8 | $350 | $5,516.00 |
| Paralegals and Law Clerks | *NIA* | *NIA* | 216.56 1987.20 | $150 | $330,564.00 |
| TOTAL: | | | 4492.78 | | $1,065,308.50 |

(*Id.*)

## 2. JGL

JGL has billed 694.85 hours on this matter for a total lodestar of $247,813.75. JGL anticipates spending 15 hours following the filing of the attorneys' fees motion on final approval documents, preparing for and attending the final fairness hearing, and communicating regarding settlement benefits, for a total of $6,750, raising the total amount of fees, without a multiplier, to $254,563.75.[8] (Doc. 350-2 at PageID 12486.) JGL seeks $26,039.59 in expenses, $582 of which is anticipated travel expenses for the final fairness hearing. (*Id.*)

JGL's billing and expense records, along with the qualifications of counsel, are supported by the Declaration of Veronica B. Nannis, a partner at JGL. (Doc. 350-2.) Ms. Nannis earned her J.D. and Master's degrees from The Catholic University of America in 2002 and was admitted to the Maryland bar that year. (*Id.* at PageID 12482.) She is a partner in JGL's complex civil litigation department and has a national practice representing whistleblowers in

---

[8] JGL allocates its anticipated future hours as follows: 12 hours to Timothy Maloney and 3 hours to Veronica Nannis.

fraud cases in federal court, some involving complex kickback schemes. (*Id.*) She has represented plaintiffs for over 15 years. (*Id.*)

Timothy Maloney is co-class counsel in this case and is a shareholder of JGL. He earned his J.D. from the University of Baltimore and was admitted to the Maryland bar in 1986. (*Id.* at PageID 12483.) Mr. Maloney has represented plaintiffs for over 30 years and has tried over 100 cases in state and federal court. (*Id.*) He regularly tries complex civil cases in the areas of commercial litigation, fraud, and constitutional violations. (*Id.*) Megan Benevento is an associate at JGL who earned her J.D. from Georgetown University Law Center in 2016 and was admitted to the Maryland bar that year. (*Id.* at PageID 12484.)

Ms. Nannis attests that the following chart reflects the experience levels, hours spent, and hourly rates of the JGL employees who have worked on this case:

| Attorney | Year Admitted | Years in Practice | Hours[9] | Hourly Rate[10] | Total Fee |
|---|---|---|---|---|---|
| Timothy Maloney | 1986 | 32 | 31.65<br>79.50 | $475<br>$602 | $15,033.75<br>$47,859.00 |
| Veronica Nannis | 2002 | 16 | 20.56<br>166.90 | $350<br>$483 | $7,196.00<br>$80,612.70 |
| Joseph Creed | 2005 | 13 | .16 | $300 | $48.00 |
| Matthew Bryant | 2007 | 11 | .15 | $300 | $45.00 |
| Timothy Creed | 2009 | 9 | 43.29<br>55.10 | $225<br>$410 | $9,740.25<br>$22,591.00 |

[9] Like SGS, JGL's billing records include two separate sets of hours: the first is the Emery-specific time using a proportional share calculation prior to this case being transferred and severed to this Court, and the second is the Emery-only time since the transfer. The total number of hours for the firm includes both sets of hours. In addition, JGL also calculated a proportionate share of fees prior to the case being transferred.

[10] JGL did not supply Rubin Committee rates to the Court and instead urges the Court to find its rates reasonable because they are in line with those from the *Laffey* Matrix, which is a schedule of rates used in the District of Columbia area originally used in *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354, 371 (D.D.C. 1983) *rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984). (*See* Doc. 357.) The Civil Division of the United States Attorney's Office for the District of Columbia has adopted the *Laffey* Matrix for its own use and publishes an updated matrix adjusted for inflation. (*See* https://www.justice.gov/usao-dc/file/796471/download (last accessed 9/12/2018)). JGL argues that it frequently appears in cases throughout the country and works closely with the U.S. Attorney's Offices and Department of Justice, and as such, uses the rates published by the U.S. Attorney's Office in the *Laffey* Matrix as the basis for their fees in federal court.

| | | | | | |
|---|---|---|---|---|---|
| Alyse Prawde | 2014 | 4 | 4.80 | $334 | $1,603.20 |
| Megan Benevento | 2016 | 2 | 112.80 | $302 | $34,065.60 |
| Hina Hussain | 2011 | 7 | 3.33 | $255 | $849.15 |
| Paralegals and Law Clerks | N/A | N/A | 56.71 119.9 | $150 $164 | $8,506.50 $19,663.60 |
| TOTAL: | | | 694.85 | | $247,813.75 |

(*Id*.)

### 3. KMK

KMK, local counsel in this case, has billed 538.95 hours in this case for a total lodestar of $206,459.75. (Doc. 350-3 at PageID 12552.) KMK anticipates eight additional hours of work in this action in preparing final approval documents and preparing for and attending the final fairness hearing, for an additional amount of $3,040, bringing the total requested amount of fees, without a multiplier, to $209,499.75.[11] (*Id*.) KMK also seeks reimbursement of $5,882.94 in expenses.

Information about KMK's billings, hourly rates, and qualification of its employees is attested to by Gregory M. Utter, a partner at KMK. (Doc. 350-3.) Mr. Utter earned his J.D. from the University of Cincinnati College of Law and was admitted to practice in Ohio in 1981. (*Id*. at PageID 12550.) He has practiced law for over 35 years, with a focus on class action and commercial litigation. (*Id*.) Melissa Schaub is an associate at KMK who earned her J.D. from The Ohio State University Moritz College of Law in 2015 and was admitted to practice in Ohio that year. (*Id*. at PageID 12552.)

Mr. Utter attests that the following chart depicts the experience levels, hours billed, and hourly rate applicable to the KMK employees who worked on this matter:

---

[11] KMK allocates its future hours as follows: 4 hours to Gregory Utter and 4 hours to Melissa Schaub.

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate[12] | Total Fee |
|---|---|---|---|---|---|
| Gregory Utter | 1981 | 37 | 283.75 | $500 (2015) $525 (2016) $540 (2017) | $148,593.00 |
| James R. Matthews | 1985 | 33 | 13.25 | $580 | $7685.00 |
| Kelley B. Tracey | 2010 | 8 | 2.50 | $330 | $825.00 |
| Sophia R. Holley | 2013 | 5 | 10.00 | $225 | $2250.00 |
| Melissa Schaub | 2015 | 3 | 200.70 | $200 (2016) $220 (2017) | $41,638.00 |
| Sarah A. Vonderbrink | 2015 | 3 | 1.20 | $195 | $234.00 |
| Samantha M. Casper | 2016 | 2 | 27.55 | $190 | $5234.50 |
| TOTAL: | | | 538.95 | | $206,459.75 |

(*Id.*)

## B. Law

Class counsel argue that their requested fee of $2,700,000 is reasonable under a percentage-of the fund method, with a lodestar/multiplier cross-check. "In common fund cases, the award of attorney's fees need only 'be reasonable under the circumstances.'" *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). Ascertaining the reasonableness of a common fund settlement requires the Court to consider factors not present in statutory fee-shifting cases:

---

[12] KMK provides the following Rubin Rates:

| Attorney | Category | Rubin Committee Rate (Year) |
|---|---|---|
| Gregory Utter | Senior Partner | $450.08 (2015), $468.08 (2016), $486.81 (2017), and $506.28 (2018) |
| Melissa Schaub | Young Associate Intermediate Associate | $225.36 (2016), $271.75 (2017), and $282.62 (2018) |

> The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. In addition, there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel.

*Rawlings*, 9 F.3d at 516. In this case, class members have not objected, nor does Defendant raise any substantive objections to the amount of fees requested. Accordingly, it is up to the Court to ensure that the proposed settlement is both fair to class members and fairly compensates class counsel for the amount of work done and the results achieved.

There are two methods for calculating attorney fees: the lodestar and the percentage of the fund. *Van Horn*, 436 F. App'x at 498. The "lodestar" is the number of hours reasonably expended on litigation multiplied by a reasonable hourly rate. *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616 (6th Cir. 2007). The percentage-of-the-fund method is when the Court determines a percentage of the settlement to award to class counsel. *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029, 1041 (S.D. Ohio 2001). District courts have discretion to select the more appropriate method for calculating attorney fees in light of the circumstances of the actual case before it. *Id.* at 1044. Consistent with the preference of many courts within the Southern District of Ohio, the Court finds the circumstances of this case render the most appropriate method to be to award a reasonable percentage of the fund with reference to the lodestar and resulting multiplier. *See Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *13 (S.D. Ohio Jan. 26, 2011).

## 1. Percentage of the Fund

Under the percentage-of-the-fund method for analyzing a request for attorney fees, the court determines a percentage of the settlement to award class counsel based on case-specific

factors.  *See Godec v. Bayer Corp.,* No. 1:10-cv-224, 2013 WL 1089549, at *2 (N.D. Ohio Mar.

14, 2013) (citing *Rawlings*, 9 F.3d at 516).  An award of one third of a common fund is within

the percentage range that courts have awarded in class action settlements in the Sixth Circuit.  *In

re Nat. Century Fin. Enters., Inc. Inv. Litig.*, Nos. 2:03-md-1565, 3:03-cv-467, 3:03-cv-656,

2009 WL 1473975, at *3 (S.D. Ohio May 27, 2009).  However, it remains incumbent upon the

Court to evaluate the propriety of the fee award in this case based on the circumstances of this

case, not necessarily what has been appropriate in other cases.

To determine whether the fee requested by class counsel is appropriate, the Court will

refer to six factors identified by the Sixth Circuit in *Ramey v. Cincinnati Enquirer, Inc.*: (1) the

value of the benefit rendered to the class; (2) society's stake in rewarding attorneys who produce

such benefits in order to maintain an incentive to others; (3) whether the services were

undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the

complexity of the litigation; and (6) the professional skill and standing of counsel involved on

both sides.  508 F.2d 1188, 1196 (6th Cir. 1974).  There is no formula for weighing these factors;

rather, the Court must consider the facts and circumstances of the case.  *Godec*, 2013 WL

1089549, at *2.  However, many courts consider the first *Ramey* factor to be the most

important—the value of the benefit to the class.  *Lonardo v. Travelers Indem. Co.,* 706 F. Supp.

2d 766, 795 (N.D. Ohio 2010).

   **a.  Benefit to Class**

As previously discussed, the value of the settlement benefits is high; class counsel

estimate that class members will recover approximately $1,160 per loan through a direct pay

structure designed to provide settlement benefits as quickly as possible with less administrative

costs.  Class counsel assert this amount is equal to nearly 65% of the title and settlement charges

related to class members' loans.  Furthermore, the amount is collectible.  Although RESPA allows for treble damages, class counsel have provided evidence that collectability of a judgment against Emery would have been uncertain due to the risk of regulatory action.  Accordingly, the Court is confident that the value of the benefits is high.

### b.  Society's Stake in Rewarding Attorneys Who Produce Benefits

The second *Ramey* factor also weights in favor of reasonableness.  The present lawsuit, an off-shoot of a larger action, has provided a vehicle for recovery for 5,289 class members. Only one class member has opted out.  Individually, it would have been difficult for each class member to pursue an action.  Reasonable attorneys' fees provide an important incentive in attracting competent counsel and deterring abusive conduct.

### c.  Contingent Fee Basis and Value of Services

The third *Ramey* factor, whether class counsel undertook the litigation on a contingent fee basis, accounts for the substantial risk involved in taking this case. Class counsel took this case on a contingent-fee basis and incurred considerable risk of non-payment, investing 5,726.58 hours in this action. Thus, they undertook significant risk if this action did not proceed to a successful resolution.

### d.  Complexity of the Litigation and Skill of Counsel

The fifth and sixth *Ramey* factors deal with the complexity of the litigation and the skill and performance of class counsel.  The alleged mortgage loan kickback scheme is part of a broader series of cases, but Emery's role was as the second largest number of loans of all lenders involved in the scheme.  As has been previously discussed, the case involved complex discovery and motion practice, with the fate of this action resting on disputed motions.  There is no doubt this is a complex case involving complex legal issues.

Regarding the skill of counsel and quality of work performed, the lawyers involved in this action have strong reputations and extensive experience, as has been outlined in the declarations submitted to this Court. Overall, class counsel have demonstrated skill and expertise in litigating this action. The substantial dollar amount of the negotiated settlement and the fact that this settlement has a direct-pay structure also speaks to the expertise of counsel. And, class counsel's work did not stop when a settlement was reached: counsel have located even more class members who will benefit from the settlement through extensive efforts since reaching resolution of this matter, which is commendable.

The Court is satisfied that class counsel's request for 30% of the settlement fund is supported by the *Ramey* factors. Similar percentages from common funds have been awarded in similar and far less complex cases. *See Vigna v. Emery*, 15-cv-51, 2016 WL 7034237 (S.D. Ohio Dec. 2., 2016) (awarding 25% of the settlement fund and applying a cross-check multiplier of 1.47 in an FLSA action that was not particularly complex); *Underwood v. Carpenters Pension Trust Fund- Detroit and Vicinity*, No. 13-cv-14464, 2017 WL 655622 (E.D. Mich. Feb. 17, 2017) (complex ERISA class action with meaningful recovery to class; awarding 28% of the common fund; conducting a lodestar cross-check and applying a multiplier of 3).

## 2. Lodestar Cross-Check

The Court will now cross check class counsel's fee request with the lodestar—the number of hours reasonably expended on litigation multiplied by the hourly rate of counsel. The result of this calculation "produces an award that *roughly* approximates the fee that the prevailing party would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (emphasis in the original). The lodestar usually is strongly presumed to yield a reasonable fee.

*City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). A reasonable fee is one which is adequate to attract competent counsel but does not produce a windfall to attorneys. *See Gonter*, 510 F.3d at 616.

### a. Hours Reasonably Expended

SGS is lead counsel on this case and began working on this action in 2013 when it involved many defendants, including Emery. JGL began working on this action in December 2015, and also performed work generally applicable to the many defendants originally involved in the Maryland action. Since this action was severed from the original action in Maryland and transferred to this Court, both firms have spent many hours on time specific to Emery. All hours have been well-documented in billing records, which the Court has carefully examined. KMK was engaged as local counsel in this action in December 2015 and has only worked on the case as it pertains to Emery. The Court has also carefully examined KMK's billing records.

Although the Court finds that overall, the hours spent were reasonable, the time billed for class certification briefing was high. There were several issues with the filing of documents, which resulted in additional filings and conferences with the Court. However, the Court will not strike any hours because Plaintiffs were successful in obtaining class certification. Furthermore, that issue aside, the work performed on this case, and the results achieved, otherwise have been excellent.

### b. Reasonable Hourly Rate

"When determining a reasonable hourly rate, 'courts use as a guideline the prevailing market rate . . . that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Van Horn*, 436 F. App'x at 498–99 (quoting *Gonter*, 510 F.3d at 618). "A district court may rely on a party's submissions, awards in

analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Id.*

As discussed *supra*, Courts in this district often refer to the 1983 Rubin Committee rates as a basis for comparison, applying a 4% annual cost-of-living allowance to the original rates. *Hunter*, 2013 WL 5467751, at *17. However, the Court is not bound by the Rubin Committee rate. In recent years, the practice of law has become an increasingly national practice. Thus, the Court will consider the nature of the case and attorneys involved in assessing the reasonableness of attorney hourly rates, keeping in mind that the party seeking attorneys' fees bears the burden of proving the reasonableness of the hourly rates claimed. *Van Horn*, 436 F. App'x at 498 (party seeking fee bears burden of proving reasonableness of the hourly rate requested); *Schumacher v. AK Steel Corp. Ret. Acc. Pension Plan*, 995 F. Supp. 2d 835, 845 (S.D. Ohio 2014) (compiling cases in which courts have awarded fees exceeding the Rubin rate); *Hunter*, 2013 WL 5467751, at *17 (approving hourly rate higher than Rubin Committee rate).

The Court finds that the hourly rates requested by SGS, ranging from $475 for lead counsel to $150 for paralegals and law clerks, to be in line with Rubin Committee rates and reasonable for the venue and nature of this case. The Court has no modification to SGS's rate and finds that they are reasonable.

Overall, KMK's rates are within the range of the applicable Rubin Committee rates, but the rates requested for Gregory Utter and James Matthews are high at $540/hour and $580/hour, respectively. Mr. Utter listed three billing rates, ranging from $500 to $525 to $540 per hour, depending upon the year. The Court will take the average of the high and low rates for a blended rate of $520/hour applicable to all time, finding that the blended rate best comports with and is in the range of applicable Rubin Committee rates, while still being on the high end of the request.

The Court will apply the same rate to Mr. Matthews, who has less experience than Mr. Utter and for whom the Court has no justification for a significantly higher rate. Otherwise, KMK's rates are within the range of the Rubin Committee rates and the Court finds them to be reasonable. With the applicable modifications, the Court finds the following rates to be reasonable and appropriate:

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate[13] | Total Fee |
|---|---|---|---|---|---|
| Gregory Utter | 1981 | 37 | 283.75 | $520 | $147,550.00 |
| James R. Matthews | 1985 | 33 | 13.25 | $520 | $6,890.00 |
| Kelley B. Tracey | 2010 | 8 | 2.50 | $330 | $825.00 |
| Sophia R. Holley | 2013 | 5 | 10.00 | $225 | $2250.00 |
| Melissa Schaub | 2015 | 3 | 200.70 | $200 (2016) $220 (2017) | $41,638.00 |
| Sarah A. Vonderbrink | 2015 | 3 | 1.20 | $195 | $234.00 |
| Samantha M. Casper | 2016 | 2 | 27.55 | $190 | $5234.50 |
| TOTAL: | | | 538.95 | | $204,621.50 |

JGL's rates are higher and deviate from comparable Rubin Committee rates the most. The rates are also two-tiered for some attorneys who have been on this case longer: a lower rate, more in line with the Cincinnati billing rates, and a higher rate, in line with D.C. rates. As explained at the final fairness hearing, JGL applied a lower billing rate prior to this case being

---

[13] KMK provides the following Rubin Rates:

| Attorney | Category | Rubin Committee Rate (Year) |
|---|---|---|
| Gregory Utter | Senior Partner | $450.08 (2015), $468.08 (2016), $486.81 (2017), and $506.28 (2018) |
| Melissa Schaub | Young Associate Intermediate Associate | $225.36 (2016), $271.75 (2017), and $282.62 (2018) |

transferred and severed. Thereafter, counsel applied their generally-applicable D.C.-area rates, which comport with the *Laffey* matrix. For example, Timothy Maloney lists two rates: $475 and $602; Veronica Nannis, senior partner level, lists rates of $350 and $483. In some cases, the higher billing rates within the firm are disproportionate to the level of experience and rates of other billing attorneys.

JGL argues in favor of its higher rates on the basis that they are generally-accepted rates in the D.C.-area in which the firm is located. The Court is mindful that it must award a reasonable hourly rate for the venue in which it is situated. *The Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686, 715 (6th Cir. 2016); *Schumacher*, 995 F. Supp. 2d at 856. The Court already has deviated from Rubin Committee rates to account for the national practice of the attorneys involved, but JGL's rates are still in excess of the rates of co-counsel. The Court is not persuaded that it should apply higher D.C.-area rates solely to JGL, where it has already considered the national practice of all the attorneys involved to justify rates in excess of the applicable Rubin Committee rates.

The Court finds that consideration of JGL's two requested rates together justifies a blended rate, achieved by adding the two rates together and dividing by two. The blended rate is in line with the rates requested by the other counsel and within the range of comparable Rubin Committee rates which are accepted in this venue. In addition, the blended rate is also a higher rate that accounts for the national practice needed to prosecute a complex case such as this. Some attorneys, however, only billed at one rate, which in some cases is too high. The rates for Alyse Prawde (admitted to the bar in 2014) and Megan Benevento (admitted to the bar in 2016) are disproportionately high compared to similarly-experienced attorneys. Accordingly, because no blended rate can be applied to these two attorneys, the Court will apply the rates used for

comparable attorneys Sarah Zadrozny (admitted to the bar in 2013) and Samantha Casper (admitted to the bar in 2016), respectively. The Court does not have any compelling reason to justify significantly higher rates. The Court therefore finds that the following rates are reasonable and appropriate:

| Attorney | Year Admitted | Years in Practice | Hours | Hourly Rate | Total Fee |
|---|---|---|---|---|---|
| Timothy Maloney | 1986 | 32 | 111.15 | $538.50 | $59,854.28 |
| Veronica Nannis | 2002 | 16 | 187.46 | $416.50 | $78,077.09 |
| Joseph Creed | 2005 | 13 | .16 | $300 | $48.00 |
| Matthew Bryant | 2007 | 11 | .15 | $300 | $45.00 |
| Timothy Creed | 2009 | 9 | 98.39 | $317.50 | $31,238.83 |
| Alyse Prawde | 2014 | 4 | 4.80 | $225 | $1,080.00 |
| Megan Benevento | 2016 | 2 | 112.80 | $190 | $21,432.00 |
| Hina Hussain | 2011 | 7 | 3.33 | $255 | $849.15 |
| Paralegals and Law Clerks | N/A | N/A | 176.61 | $157 | $27,727.77 |
| TOTAL: | | | 694.85 | | $220,352.12 |

**c. Multiplier**

A multiplier is, "[b]y its very nature, . . . a 'bonus' to the attorneys, compensating them beyond what they would otherwise have earned from a paying client." *Van Horn*, 2010 WL 1751995, at *5. Whether to enhance a lodestar calculation with a multiplier is within the sound discretion of the district court. *Wells v. U.S. Steel*, 76 F.3d 731, 737 (6th Cir. 1996). However, the Supreme Court has cautioned that courts should hesitate to employ a multiplier, especially when the factors supporting a multiplier already have been considered in the underlying lodestar calculation. *Perdue*, 559 U.S. at 554. Although *Perdue* was decided in the context of statutory fee shifting under 42 U.S.C. § 1988 and did not address the propriety of multipliers in class actions, the case nonetheless cautions that enhancements are atypical and should not be used when the circumstances do not warrant it.

The parties ask the Court to approve a 1.75 cross-check multiplier on their lodestar. With the changes to hourly rates, the new total lodestar is: $1,492,120.37,[14] which yields a 1.81 cross-check multiplier to achieve an award of 30% of the common fund.[15] Overall, the legal work performed and results obtained in this case have been exceptional. The Court finds that a 1.81 multiplier to the lodestar is within the range of multipliers this Court and others have found reasonable. *See, e.g.*, *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005) (upholding the district court's award of a 1.75 multiplier where the results achieved were extraordinary and the case was highly controversial); *Michel v. WM Healthcare Solutions, Inc*., No. 1:10-cv-638, 2014 WL 497031, at *18 (S.D. Ohio Feb. 7, 2014) (1.8 multiplier, viewed as "generous" under the circumstances in a junk fax case); *AK Steel v. Lowther*, No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012) (lodestar multiplier of 3.06 in ERISA action was appropriate in light of the circumstances of the case and extraordinary service rendered by counsel on behalf of the class); *Bower v. MetLife, Inc.*, No. 1:09-cv-351, 2012 WL 12991199, at *8 (S.D. Ohio Oct. 17, 2012) (finding a 1.75 multiplier on counsel's $1.3 million lodestar to be within the range of multipliers applied to lodestars in the Southern and Northern Districts of Ohio and collecting cases); *Underwood*, No. 13-cv-14464, 2017 WL 655622 (ERISA class action; awarding 28% of the common fund; conducting a lodestar cross-check and applying a multiplier of 3); *but see Van*

---

[14] The total lodestar is calculated by adding the following total fees: $1,065,308.50 (SGS) + $204,621.50 (KMK) + $220,352.12 (JGL) = $1,490,282.12.

[15] Although all three firms requested time for future hours, the Court will exclude these hours and finds that the multiplier employed in its lodestar cross-check accounts for future work. Here, SGS, with the bulk of the requested future hours (50 hours) did not breakdown its anticipated future lodestar by attorney and billing rate, which makes it difficult for the Court to evaluate. The additional future hours requests were negligible and would not have a significant impact on the overall fee request. In addition, the Court would not be inclined to award a multiplier on future fees, as the risk of litigation is removed post-settlement. With these factors in mind, therefore, the Court will instead base its lodestar cross-check only on time actually spent, with the understanding that there is still some anticipated work to be done.

*Horn,* 436 F. App'x at 499 (court did not abuse its discretion in applying a reduced 1.2 multiplier where class members had not received an especially good benefit, the claims rate was low, and the case not based on a novel legal theory, factors not applicable here).

Accordingly, the Court will apply a 1.81 multiplier to the lodestar cross-check, which demonstrates the reasonableness of class counsel's requested fee of 30% of the common fund.

### d. Expenses

Counsel request $81,450.31 in expenses, broken down as follows: SGS expenses: $49,527.78; JGL expenses: $26,039.59; KMK expenses: $5,882.94. The Court has reviewed the billed and anticipated expenses and finds that they are reasonable. Accordingly, it will award the requested amount in expenses.

### C. Service Awards

Frank and Shelly Palombaro, Kevin and Jennifer McAlpin, Gary Ratcliff, and David and Melinda Alvarado seek Court approval of service awards in the amount of $5,000 per representative. Under the Settlement Agreement, service awards are paid from the common fund and are in addition to class representatives' other settlement benefits. There are no objections to the service awards.

District courts have approved incentive fund payments to named plaintiffs, but the Sixth Circuit has been skeptical of such payments citing a fear that "incentive awards may lead named plaintiffs to expect a bounty for bringing suit." *Roland v. Convergys Customer Mgmt. Grp., Inc.*, No. 1:15-CV-00325, 2017 WL 4873343, at *4 (S.D. Ohio Jan. 10, 2017) (citing *Shane Grp., Inc., v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 310–11 (6th Cir. 2016) (citation omitted)); *see also*, *e.g.*, *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) (stating that courts should be dubious of incentive awards that make the named plaintiff whole or

greater than whole because such named plaintiffs have less incentive to protect the interests of class members). To ensure that amounts are not a bounty, the Sixth Circuit has instructed that counsel must provide the court with specific documentation, in the manner of time sheets, of time spent on the case by each recipient of an incentive award. *Shane*, 825 F.3d at 311.

In support of the requested service awards, class counsel Mr. Smith has attested to the involvement of each class representative. (Smith Decl., Doc. 350-1 at PageID 12182.) In addition, each class representative submitted a declaration attesting to his or her time spent participating in the case. (Docs. 358, 358-1–358-7.) Although they are not time sheets in the manner of attorney billing records, the Court is satisfied that the declarations estimate the time spent on the case and demonstrate that each class representative has contributed meaningfully to this case through their involvement. Class representatives have answered interrogatories, responded to requests for production of documents, prepared and sat for deposition, consulted with counsel, and made themselves available to counsel during settlement negotiations.

Having considered these declarations, the Court will approve the seven incentive awards to the named class representatives. Each class representative's participation contributed to a meaningful recovery in this case. The award of $5,000 is not so disproportionate to the average recovery of each class member so as to render it a "bounty." In addition, although some class representatives are married, the Court is satisfied that each individual participated fully in the case. Thus, the service awards appropriately incentivize active, effective, and meaningful participation in class action litigation, which is necessary to move the case forward and, in this case, reach a meaningful settlement.

**IV. Conclusion**

The Court finds that the settlement is fair, reasonable, and adequate. It also finds that class counsel's attorneys' fees and expenses are reasonable, as are the service awards to the named class representatives. Based on the foregoing, **IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for Final Approval of Emery Federal Credit Union Class Action Settlement (Doc. 355) is **GRANTED**;

2. Class Counsel's and Class Representatives' Unopposed Petition for Attorneys' Fees and Expenses and for Class Representatives' Service Awards for Emery Federal Credit Union Settlement (Doc. 350) is **GRANTED**. Class counsel shall be awarded attorneys' fees in the amount of 30% of the common fund, or $2,700,000.00, and reimbursement of out-of-pocket expenses in the amount of $81,450.31, which shall be paid out of the common fund, in accordance with the Settlement Agreement;

3. Class representatives Frank Palombaro, Shelly Palombaro, Kevin McAlpin, Jennifer McAlpin, Gary Ratcliff, David Alvarado, and Melinda Alvarado shall each receive a service award of $5,000.00, for a total of $35,000.00, for their participation in the litigation and settlement. The service awards will be paid out of the common fund and shall be paid in addition to the settlement benefits available to them, in accordance with the Settlement Agreement;

4. Within twenty-one (21) days after entry of this Order, Emery shall remit to the Settlement Administrator $8,950,000.00 into the common fund account to fully fund the settlement benefits and other fees and expenses awarded, in accordance with the Settlement Agreement;

5. From the common fund, less the adjustments set forth in the Settlement Agreement, the settlement administrator shall remit the settlement benefits payable to the Emery Class members, in accordance with the Settlement Agreement. Any funds remaining in the common fund account after the payment of settlement benefits in accordance with and pursuant to the process described in the Settlement Agreement, shall be contributed to and remitted by the settlement administrator to Habitat for Humanity International, in accordance with the Settlement Agreement;

6. All claims asserted in this action against Emery are hereby dismissed with prejudice;

7. The class representatives and the members of the Emery Class are bound by the terms of the Release, Waiver, and Covenant Not to Sue set forth in Section 16 of the Settlement Agreement, and are permanently enjoined from filing suit or asserting any claims, demands and/or counterclaims with respect to matters released in Section 16 of the Settlement Agreement;

8. The Court finds that there is no just reason for delay and that this Order shall be deemed a final judgment against Emery under Rule 54(b) of the Federal Rules of Civil Procedure; and

9. Should the parties to the Settlement Agreement or the members of the Emery Class bound thereby fail to honor the terms of this Order, the non-breaching party may petition the Court for enforcement of this final judgment Order.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court